735 F.2d 1525
 26 Wage & Hour Cas. (BN 1295, 237 U.S.App.D.C. 89,
101 Lab.Cas. P 34,546
 INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS,
WAREHOUSEMEN AND HELPERS OF AMERICA, Petitioner,
v.
UNITED STATES of America, Respondent,
American Trucking Association, Inc., Intervenor.
 No. 83-1228.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 13, 1984.
Decided June 12, 1984.
As Amended June 12, 1984.
 
 Petition for Review of a Rulemaking Order of the Federal Highway Administration.
 Joseph E. Santucci, Jr., Washington, D.C., with whom Robert M. Baptiste and Roland P. Wilder, Jr., Washington, D.C., were on the brief, for petitioner.
 Kathleen S. Markman, Atty., Dept. of Transportation, Washington, D.C., for respondent.
 Nelson J. Cooney and Robert A. Hirsch, Washington, D.C., entered appearances for intervenor.
 Before WRIGHT and SCALIA, Circuit Judges, and MacKINNON, Senior Circuit Judge.
 Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.
 J. SKELLY WRIGHT, Circuit Judge:
 
 
 1
 The International Brotherhood of Teamsters, petitioner in this case, seeks to have this court overturn new regulations issued after notice and comment rulemaking by the Bureau of Motor Carrier Safety of the Federal Highway Administration (the agency). In order to promote highway safety, the agency or its predecessors have for 40 years regulated the number of consecutive hours that a truck driver is allowed to drive. See 49 C.F.R. Sec. 395 (1982) (codification of current regulations). To enforce these regulations, the agency has traditionally required that drivers keep a log detailing the amount of time they spend on duty. The log had to be kept on a particular form of the kind specified by the agency.
 
 
 2
 In the rulemaking at issue here, see 47 Fed.Reg. 53383 (Nov. 26, 1982), the agency revamped the logkeeping requirements. The changes were essentially threefold: (1) The new rules permit drivers to use recordkeeping forms of their own design, rather than the standardized forms specified by the prior regulations. (2) The new rules permit drivers to omit from their recordkeeping forms seven items of information included on the old mandatory forms. (3) The new rules substantially broaden the exemption from the recordkeeping requirement for certain local drivers. After briefly recounting some background information concerning the recordkeeping requirements, we discuss each of these three specific changes in turn.
 
 I. THE RECORDKEEPING REQUIREMENT
 
 3
 Since 1938 the agency or its predecessors have required drivers to keep logs, which are of crucial importance in the enforcement of the regulations governing maximum driving and on-duty time. Enforcement agents refer to the logs in roadside inspections; if an examination of the log indicates that the driver is not in compliance with the maximum hours regulations, he may be placed off duty. 47 Fed.Reg. at 53384. In addition, the agency conducts management audits at terminals to determine a carrier's overall compliance with the maximum hours regulations. Id. The agency has noted that the log is "the principal document that is accepted by the court system as evidence to support enforcement actions for excess hours of service violations." Id. In the agency's words, "Currently, [the driver's log] is the only single universally recognized instrument available to both Government and industry to insure compliance with the hours of service rules." Id. The agency has underlined its belief in the importance of the recordkeeping requirement by stating that "[t]ermination of [the] recordkeeping requirement * * * would be contrary to the very essence of the safety regulatory philosophy of the [agency] and in contradiction to the Act under which it was promulgated." Id. The importance of a recordkeeping requirement is not at issue in this case.
 
 
 4
 The form of the log changed only rarely over the years, most notably in 1952 and 1965. See id. Before 1977 drivers had to fill out a separate form for each 24-hour period on duty. However, on November 4, 1977 the agency promulgated regulations permitting drivers to combine the single-day form, MCS-139, with copies of a supplementary form, MCS-139A, to enable them to keep track of periods as long as seven days without filling out a separate form for each day. See 42 Fed.Reg. 58525 (Nov. 10, 1977). Until the current regulations, however, drivers have had a choice between at most two kinds of forms (single-day or multi-day) on which they could record the required information.
 
 
 5
 The log forms in use before the current rulemaking contained two important types of information. Most important was a "grid" on which a driver would indicate for each hour of the day his duty status: "off duty," "sleeper berth," "driving," "on duty (not driving)." See, e.g., 49 C.F.R. Sec. 395.8 at 489 (1982) (example of completed log under old rules). In addition, the rules required the driver to fill in much other information, such as the date, total mileage, vehicle identification, name of co-driver, home terminal, etc. Under the old rules the driver had to keep a copy of the log in his possession while on duty for 30 days and the driver's employer had to keep the logs on file for 12 months. 49 C.F.R. Secs. 395.8(s), 395.9(u) (1982).
 
 II. USE OF NON-STANDARDIZED FORMS
 
 6
 The agency's new rules retain the grid used on its earlier forms, as well as much (but not all, see Part III infra ) of the information that was formerly required. The agency continues to require that drivers and carriers retain the logs for the same time periods as under the old rules. The major difference is that the drivers need no longer use the standardized forms prescribed by the agency (although those forms continue to be perfectly acceptable). Instead, the driver may use forms of different designs as long as those forms contain at a minimum the grid plus certain other prescribed information.
 
 
 7
 The point of the change is to reduce the paperwork burden. The logkeeping forms under the old rules had to contain precisely the information specified under those rules, no more and no less. Therefore, many carriers were forced to insist that their drivers fill out one form for internal company purposes (for example, keeping track of drivers' time for payroll records) and another form to meet the agency's logkeeping requirements. Because the agency's logs in form or content were unsuitable for internal company use, the carriers and drivers in effect had to keep two sets of books. This burden has been eliminated under the new rules, which approve the use of company-designed forms in place of the formerly-required logs, as long as the company's forms contain the grid plus other specified information.
 
 
 8
 Incredibly, the union in this case addresses its major challenge to this innocuous-seeming change in rules. The union argues that the change was arbitrary and capricious under Section 10 of the Administrative Procedure Act, 5 U.S.C. Sec. 706(2)(A) (1982), because the agency illicitly traded safety concerns for the economic benefits of the reduction in paperwork.
 
 
 9
 The agency's authority to issue safety regulations derived from 49 U.S.C. Sec. 304(a)(1) (1976), which stated:
 
 
 10
 It shall be the duty of the [agency]--
 
 
 11
 (1) To regulate common carriers by motor vehicle * * *, and to that end the [agency] may establish reasonable requirements with respect to * * * uniform systems of accounts, records, and reports, preservation of records, qualifications and maximum hours of service of employees, and safety of operation and equipment.[1]
 
 
 12
 The union's primary argument is that this provision prohibits the agency from taking any action that advances any other goal at the expense of a decrease--however slight--in highway safety. In addition, the union argues that the former logkeeping requirement should be accorded a particularly strong presumption of validity because it had been a (moderately) consistent and (very) longstanding agency interpretation of its regulations. Finally, the union supports its position on the ground that the large majority of comments received by the agency concerning the new regulations expressed support for the old rules.
 
 
 13
 The agency largely seems to agree with the union: "The safety of the traveling public must not be compromised by weakening a national enforcement capability solely for the purpose of reducing paperwork burden." 47 Fed.Reg. at 53387. However, according to the agency, reduction of the paperwork burden is a desirable goal if "this course of action would preserve the national hours of service enforcement capability * * *." Id.
 
 
 14
 In support of its authority to consider goals other than safety, the agency makes two arguments. First, it argues that Section 304(a) merely authorizes it to promote safety in a sensible and reasonable fashion under the circumstances; such a statute should not (in the absence of some indication to the contrary) be read as a mandate that the agency must remain completely oblivious to all other desirable policy objectives while carrying out the statutory goals. In other words, according to the agency the statute permits it to consider factors other than safety in exercising its delegated authority. Second, the agency points out that other statutes command it to consider other goals. In particular the agency points to the provisions of 44 U.S.C. Sec. 3501 et seq. (Supp. V 1981), which require federal agencies to do everything in their power to minimize the burdens imposed on private parties by the agencies' need to gather information. The statute explicitly forbids any agency from "conduct[ing] or sponsor[ing] the collection of information unless * * * (1) the agency has taken actions * * * to * * * (B) reduce to the extent practicable and appropriate the burden on persons who will provide information to the agency." 44 U.S.C. Sec. 3507(a) (Supp. V 1981). Sections 3504 through 3509 set up a comprehensive scheme vesting in the Office of Management and Budget (OMB) authority to review agency information collection requests and reject those that impose unnecessary paperwork burdens on private parties. According to the agency, this entire scheme would make no sense if OMB was the only agency that could attempt to reduce paperwork; rather the statutory provisions necessarily imply that other agencies will on their own attempt to reduce the burdens they impose on the regulated entities. Moreover, in this case it seems that the agency was in large part following OMB instructions to reduce the burdens caused by the old logkeeping requirements. See 47 Fed.Reg. at 53385.
 
 
 15
 We generally agree with the agency. The union fails to call our attention to any special features of the regulatory scheme that would indicate that Section 304(a) should be interpreted so as to exclude the agency from taking nonsafety goals into account in enacting or modifying safety regulations. Moreover, this court has rejected a very similar challenge to action taken by the same agency pursuant to the same statute. In Professional Drivers Council v. Bureau of Motor Carrier Safety, 706 F.2d 1216 (D.C.Cir.1983), we held that it was "permissible for the agency to consider costs and benefits in deciding not to amend its regulations." Id. at 1222. It should be similarly permissible for the agency to consider the economic costs in deciding to amend the same regulations. In the absence of clear congressional direction to the contrary, we will not deprive the agency of the power to fine-tune its regulations to accommodate worthy nonsafety interests.[2]
 
 
 16
 Given that it was permissible for the agency to consider nonsafety-related factors in evaluating its logkeeping requirements, our review must ask whether in this case the agency acted arbitrarily and capriciously in promulgating the new rules that permit drivers to keep their logs on nonstandardized forms.
 
 
 17
 In its original notice of proposed rulemaking, the agency had suggested that it might abolish the standardized log requirement altogether. See 47 Fed.Reg. 7702 (Feb. 22, 1982). The proposed rules would have replaced the standardized log with a regime in which each driver or carrier would be required to keep a log that included at least certain minimum information; these nonstandardized logs could record the information in any form at all. See id. at 7705. A large majority of the 1,300 comments received by the agency were opposed to this--or any--change, though many of these comments were postcard forms expressing little or no rationale for the opposition. The weightiest concern expressed was the need for uniformity; by permitting each carrier to use an entirely different form the new rules would cause confusion among federal and state enforcement agents who were accustomed to use the old standardized forms. Safety, according to some of the commenters, would necessarily suffer as enforcement agents would be forced to spend more time deciphering the myriad of individualized forms with which they would be faced. A subsidiary concern expressed was that the change could encourage each state to promulgate its own forms for use within its borders, thus causing an increased--rather than a decreased--paperwork burden.
 
 
 18
 The agency responded to these comments by deciding to retain significant elements of standardization. Thus, although drivers need not use standardized forms under the new rules, whatever form they use must contain the standardized, easily-recognizable grid. As the agency said, "The presence of a standard grid on the carrier's form will result in universal recognition of any document tendered as an official hours of service record, thus overcoming most objections to the complete elimination of a standardized form requirement." 47 Fed.Reg. at 53387. The agency's conclusion is thus that the combination of standardized grid plus nonstandardized recording of other data will not significantly hinder enforcement of the maximum hours regulations. Cf. Int'l Ladies' Garment Wkrs. Union v. Donovan, 722 F.2d 795, 821-822 (D.C.Cir.1983) (discussing deference to agency's "predictive judgments about areas that are within the agency's field of discretion and expertise"). It is of course possible that the agency's judgment on this point is wrong. But the agency has made a reasonable prediction based on its experience with the old forms, the comments received in the rulemaking proceeding, and the results of a pilot program to test alternative recordkeeping systems. See 47 Fed.Reg. at 53387. If we accept (as we must) the agency's reasonable prediction that the new rules have no substantial impact on enforcement of safety regulations, we must conclude that the agency did not act arbitrarily or capriciously in adopting the new rules on the basis of the economic benefits of decreased paperwork.
 
 
 19
 The union does raise one further challenge to this aspect of the new rules. The new rules were based in part on data gathered when an outside consultant arranged for small groups of drivers to use alternative recordkeeping methods for a test period. See id. at 53385. The agency admitted that the test program had a natural (and unavoidable) bias toward changing the old rules because "drivers in the program were all employed by fleets whose managements were initially receptive to experimentation with the alternate concepts." Id. According to the union, given this admitted bias it was irrational for the agency to rely on the data gathered by the test program to support its claim that the new rules would in fact reduce the paperwork burden. Moreover, the union claims that the agency erred in using the consultant's estimate of savings ($164.1 million) in deciding that the new rules were justified; as the union points out, the final rules adopted did not precisely match the recommendations on which the consultant's estimate was based.
 
 
 20
 We agree with the union that the consultant's estimate cannot be taken to be an absolutely accurate prediction of savings from the new rules; indeed, we would perhaps doubt any such figure accompanied by a claim of absolute accuracy. However, given that permitting nonstandardized forms under the new rules will not have a substantial impact on safety, the agency would be acting rationally in adopting the new rule as long as some significant economic advantage could be achieved. Even if the precision of the $164.1 million savings estimate is doubtful, the estimate does supply substantial evidence that the new rule would offer a significant economic advantage. Therefore, finding that the agency acted reasonably in permitting the use of nonstandardized forms, we reject the union's attack on this aspect of the new rules.
 
 III. OMITTING SEVEN ITEMS OF INFORMATION
 
 21
 Although we find the agency not to have acted arbitrarily and capriciously in the central thrust of the rulemaking at issue--permitting the use of nonstandardized forms--we have much greater difficulty with subsidiary changes that the agency made at the same time. The first of these changes governs the types of information that must be included on the recordkeeping forms. The new rules require drivers to use the standardized grid and to include on any form they use the following eight "data elements": date, total miles driving today, truck or tractor number, name of carrier, driver's signature/certification, 24-hour period starting time, main office address, and remarks. 47 Fed.Reg. at 53389. However, the new rules no longer require drivers to include seven items of information that were a part of the log forms required by the old rules: total mileage today, name of co-driver, home terminal address, total hours, shipping document numbers or name of shipper and commodity, origin, and destination or turnaround point. Id. at 53387. The union alleges that these items of information are vitally important as checks on the driver's accuracy in filling out the grid. For instance, in an audit at a carrier's terminal an enforcement official could compare a particular driver's grid with the grid of his co-driver to determine if the drivers accurately reported their hours driving and their hours on duty not driving. Similarly, in a highway check an enforcement agent could compute the distance from a driver's origin to his current location and compare that with the supposed total time to determine whether it was possible for the driver and co-driver to cover that distance in the amount of time indicated.
 
 
 22
 The agency attempted to justify omission of the seven items from the new recordkeeping requirement by stating that "it has been determined that certain information currently required on the log may be unnecessary for enforcement purposes." Id. The agency noted that "[t]hese deletions are expected to reduce driver preparation by approximately 50 percent without affecting the enforcement capability." Id. at 53388. This is literally all the agency had to say about its action. Its brief comments are not accompanied by any explanation of how the 50 percent saving was calculated.[3] In addition, unlike the agency's careful attention to the arguments advanced against its decision to permit drivers to use nonstandardized forms, the agency in deciding to omit the seven items does not discuss, consider, or otherwise admit the existence of the possibility that the items have been useful to enforcement agents over more than 30 years. And the agency's rulemaking makes no citation or reference whatever to the administrative record, which appears to us to be devoid of any support for the deletion of the seven items.
 
 
 23
 Our review of the agency's action in this case is based on the principles we recently outlined under the "arbitrary and capricious" standard of the APA in Int'l Ladies' Garment Wkrs. Union v. Donovan, supra, 722 F.2d at 814-815. The "keystone" of our inquiry is "to ensure that the [agency] engaged in reasoned decisionmaking." Id. at 815. The agency itself must supply the evidence of that reasoned decisionmaking in the statement of basis and purpose mandated by the APA. Id. at 814-815; see 5 U.S.C. Sec. 553(c) (1982). Although we will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974), a corollary of this oft-cited statement is that we have neither the expertise nor the authority to substitute our judgment for that of the agency and provide an explanation where the agency's path is entirely uncharted.
 
 
 24
 In this case the seven items of information seem to have been required for at least 30 years; this indicates that those items were once thought to serve some law enforcement function. We fully recognize that "[r]egulatory agencies do not establish rules of conduct to last forever," American Trucking Ass'ns, Inc. v. Atchison, Topeka & Santa Fe R. Co., 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847 (1967), and that agencies must be given ample latitude to "adapt their rules and policies to the demands of changing circumstances," Permian Basin Area Rate Cases, 390 U.S. 747, 784, 88 S.Ct. 1344, 1369, 20 L.Ed.2d 312 (1968). Accord Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co., --- U.S. ----, ----, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (quoting above cases). Nonetheless, when an agency seeks to change a settled policy, the record must at least indicate what led it to make the change. Greater Boston Television Corp. v. FCC, 444 F.2d 841, 852 (D.C.Cir.), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). As the Supreme Court stated in Motor Vehicle Manufacturers, supra, --- U.S. at ----, 103 S.Ct. at 2866, "If Congress established a presumption from which judicial review should start, that presumption * * * is not against safety regulation, but against changes in current policy that are not justified by the rulemaking record." (Emphasis in original.)
 
 
 25
 In the light of the above principles, our review focuses on whether the agency explained its change of policy with respect to the seven items of information. Of course, the agency's unsupported assertion that these items are "unnecessary" is insufficient, for such an unsupported assertion states a result, not a reason. And aside from the bald assertion that the items are unnecessary, we can find no other indication in the record as to why the agency decided to change its long-established policy. Therefore, in the light of the record evidence and the agency's own conclusions--and in the absence of any hint as to the basis for the agency's conclusion that the items were "unnecessary for law enforcement purposes"--we are forced to conclude that the agency acted arbitrarily and capriciously in omitting the seven items from the new recordkeeping requirement.
 
 IV. THE 100-MILE/12-HOUR EXEMPTION
 
 26
 The final issue in this case concerns the agency's expansion of an exemption from the recordkeeping requirement. Before the spring of 1980 the logkeeping regulations contained an exemption for drivers who operated their vehicles beyond a 50-mile radius from their work reporting location and returned to their work reporting location within 15 hours of reporting for duty. See 49 C.F.R. Sec. 395.8(t) (1982). The exemption (subject to some further qualifications not relevant here) only applied if the driver's employer maintained full time cards or other records showing the number of hours the driver is on duty, the time the driver reports for work, and the time the driver leaves each day. The exemption seems to be based on the assumption that many drivers engaged in primarily local deliveries spend as much or more time out of the truck as they do in the truck. Therefore, the burden imposed by a requirement that they keep track of every minute is rather more severe than the burden imposed by the same requirement on long-distance drivers, while the possibility that the local drivers will actually be behind the wheel for periods longer than permitted under the maximum hours rules will be slim. Therefore, although these drivers continued to be covered by the maximum hours rules, they were exempted from the logkeeping requirements.
 
 
 27
 In 1980 the agency modified the exemption from the logkeeping requirement by increasing the 50-mile limit to 100 miles while decreasing the 15-hour limit to 12 hours. 45 Fed.Reg. 22042 (April 3, 1980). After the agency made this change, petitions were filed to change the rules once again. A number of carriers contended that companies with heavy seasonal swings--such as home heating oil and farm fertilizer delivery--must keep their drivers on duty extra hours during their busy seasons. Yet many of these companies are engaged in merely local deliveries and have no need to send their drivers beyond the 50-mile limit. Thus, it was argued, these companies were penalized by the modification made in 1980. The suggested remedy was to reinstate the old 50-mile/15-hour limit as an alternative exemption; drivers who met either its requirements or the requirements of the 100-mile/12-hour rule would be exempt from the recordkeeping requirement. 47 Fed.Reg. at 53388. In response to these requests the agency simply expanded the exemption, adding three hours to the time limit; the new rules thus exempt drivers who go no more than 100 miles from their base and are on duty no more than 15 hours a day. The union argues that this expansion was arbitrary and capricious.
 
 
 28
 The agency justifies expanding the exemption by noting that the problem raised by the 1980 changes--i.e., making the exemption inapplicable to some drivers who previously could have taken advantage of it--"was unintended." Id. The agency goes on to note that expanding the exemption does not
 
 
 29
 negate the 10 hour driving time rule. Under this exemption a driver may not drive more than 10 hours following 8 consecutive hours off duty, nor drive after being on duty 15 consecutive hours. While the log exemption would make violating more difficult to detect, we believe that investigative techniques will allow adequate enforcement of the regulation. If experience shows this is not the case, appropriate rulemaking action will be initiated.
 
 
 30
 Id.
 
 
 31
 To the extent that the above provides any justification at all for expansion of the exemption, we find that it is inadequate. The statements concerning the availability of "alternative investigative techniques" might be a reasonable basis for modifying the regulation when accompanied by a record that revealed what those techniques were; in this case the agency provides no examples of such techniques or any references or citations to the record that support the existence of such techniques. Cf. Int'l Ladies' Garment Wkrs. Union v. Donovan, supra, 722 F.2d at 818-826. Moreover, the agency itself notes the crucial importance of the recordkeeping rules it is promulgating. See 47 Fed.Reg. at 53384 (termination of recordkeeping requirement "would be contrary to the very essence of the safety regulatory philosophy of the FHWA and in contradiction to the Act under which it was promulgated"). It is difficult to square the agency's emphasis on the importance of the recordkeeping requirement with the alleged easy availability of alternative enforcement techniques.
 
 
 32
 The agency does seem to believe that the expansion is justified because the effect of the 1980 change (bringing some formerly exempt drivers within the ambit of the recordkeeping requirement) was "unintended." Unfortunately, this result could not have been (and in fact was not) unintended. When the agency made the 1980 changes, it increased the distance and decreased the number of hours for the exemption. As a matter of logic, the two changes would necessarily result in requiring some nonexempt drivers (i.e., those who travel only 50 miles from their home base but stay on duty for 12 to 15 hours at a stretch) to comply with the recordkeeping requirement. As a matter of fact, the agency seems to have been fully cognizant of this result in 1980; as it pointed out then:
 
 
 33
 Another argument raised by certain commenters against the 12-hour limit was that some drivers may now be operating within the 50-mile radius exemption who, under the 100-mile radius exemption, would now have to prepare a log. However, since FHWA is expanding the area of operation fourfold, a limitation is necessary to ensure that the hours of service are not violated. * * * It should be clearly understood that once a driver exceeds that 12-hour limitation, the 100-mile exemption would no longer be applicable for that day and the hours of service for that day would have to be recorded on a driver's log.
 
 
 34
 45 Fed.Reg. at 22043. The 1980 rules merely adjusted the mileage and time limits to bring different drivers (not necessarily more drivers) within the exemption. The agency may not thus rely on the intentions underlying its 1980 changes to now expand the exemption significantly.[4] In short, the agency has failed to provide any justification--either in its current rulemaking or by referring to its 1980 changes--for expanding the exemption. We understand the agency's inability to provide a justification, because our examination of the record fails to disclose any material that could provide the basis for such a justification.
 
 V. CONCLUSION
 
 35
 Agency action comes before us for review accompanied by a presumption of regularity, and we hesitate to overturn it because an agency has published an inartful statement of basis and purpose in the Federal Register. Particularly with respect to relatively minor changes like those made by the agency in this case, we would not interfere with the agency's decision where its course "may reasonably be discerned." We therefore uphold the agency's modification of the recordkeeping requirement to permit drivers to use their own forms. However, the agency has failed to demonstrate that it engaged in reasoned decisionmaking or that it had any basis at all for its decisions to omit the seven items of information and expand the exemption from the recordkeeping requirement. For this reason, we hold that the agency acted arbitrarily and capriciously in adopting the new rules to the extent that they omit the seven items of information from the recordkeeping requirement and to the extent that they expand the exemption from the recordkeeping requirement.
 
 
 36
 Affirmed in part and vacated in part.
 
 
 
 [1]
 Section 304(a)(1) grants authority only to regulate common carriers. However, Secs. 304(a)(2) and 304(a)(3) grant similar power to regulate contract and private carriers. Section 304(a) is by terms a grant of authority to the Interstate Commerce Commission. The Commission's power to regulate driver qualifications and safety were delegated after 1966 to the Federal Highway Administration as a division of the Department of Transportation. See 49 U.S.C. Secs. 1655(e)(6)(C) and (f)(3)(B) (1976). Authority has in turn been delegated to the Bureau of Motor Carrier Safety. See 49 C.F.R. Sec. 301.60 (1982). Since the promulgation of the regulations in question, Sec. 304(a) has been superseded by Pub.L. No. 97-449, 96 STAT. 2438, codified at 49 U.S.C.A. Sec. 3102 (1983). The new provision grants power to the Secretary of Transportation to prescribe regulations for "qualifications and maximum hours of service of employees of, and safety of operation and equipment of" motor carriers
 
 
 [2]
 We reach this conclusion while construing the specific statute at issue in this case. We express no opinion about whether other safety statutes--which may embody varying congressional directives and may establish varying regulatory systems--should be similarly interpreted. Cf., e.g., American Textile Mfrs. Institute, Inc. v. Donovan, 452 U.S. 490, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981) (interpreting 29 U.S.C. Sec. 655(b)(5) (1982))
 
 
 [3]
 The closest approximation that we can find to an explanation of the agency's rationale for omitting the seven items of information occurs in the discussion of the issue in the agency's brief on appeal. See brief for respondent at 25-27. It is well settled that our review cannot be based on post hoc rationalizations by counsel. See Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co., --- U.S. ----, ----, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983); Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 419, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971); Burlington Truck Lines v. United States, 371 U.S. 156, 168-169, 83 S.Ct. 239, 245-246, 9 L.Ed.2d 207 (1962). It is noteworthy that the discussion in the brief does not contain a single citation to the record
 
 
 [4]
 The expansion of the exemption under the new rules may be more significant than the apparent 25% expansion from 12 to 15 hours would indicate. The maximum hours regulations--stripped of qualifications irrelevant for present purposes--limit a driver to 10 hours behind the wheel each day. 49 C.F.R. Sec. 395.3 (1982). Before the instant rulemaking drivers whose tour of duty lasted less than 12 hours were eligible for the exemption. Thus only drivers who spent less than two hours out of 12 (one-sixth) of their on-duty time not driving would break the maximum hours rules. The rules must therefore have been predicated on the assumption that it was unlikely that local drivers would spend less than one-sixth of their on-duty time not driving. Under the new rules, however, a local driver whose tour of duty lasts 15 hours may still qualify for the exemption; the comparable assumption must therefore be that local drivers will spend at least five hours out of fifteen, or one-third of their on-duty time, not driving. Thus, at least when seen from this perspective, the new rules represent a doubling (from one-sixth to one-third) of the amount of time that the agency is willing to assume a local driver is not driving during a given tour of duty