758 F.2d 685
 22 ERC 1691, 244 U.S.App.D.C. 365
 AIRMARK CORPORATION, Petitioner,
v.
FEDERAL AVIATION ADMINISTRATION, Respondent,
Transamerica Airlines, Inc., Delta Air Lines, Inc., American
Airlines, Inc., Intervenors.
CAREFREE VACATIONS, INC. and Worldwide Airlines, Inc., Petitioners,
v.
FEDERAL AVIATION ADMINISTRATION, Respondent,
Transamerica Airlines, Inc., Delta Air Lines, Inc., American
Airlines, Inc., The Flying Tiger Line, Inc.,
National Airlines, Inc. and Air
Transport International, Inc.,
Intervenors.
TRADEWINDS AIRWAYS, LTD., Petitioner,
v.
DEPARTMENT OF TRANSPORTATION and Federal Aviation
Administration, Respondents,
Transamerica Airlines, Inc., Delta Air Lines, Inc., American
Airlines, Inc., The Flying Tiger Line, Inc., Intervenors.
 Nos. 84-1619, 84-1654 and 84-1657.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 27, 1985.
Decided March 29, 1985.
 
 Petitions for Review of Orders of the Federal Aviation administration.
 Herbert A. Rosenthal, Washington, D.C., with whom Robert M. Hausman, Washington, D.C., was on the brief, for petitioners Airmark Corp., and Carefree Vacations, Inc., et al.
 Joanne W. Young, Washington, D.C., with whom Mahlon M. Frankhauser, Washington, D.C., was on the brief, for petitioner Tradewinds Airways, Ltd.
 Anne S. Almy, Atty. Dept. of Justice, Washington, D.C., with whom Peter R. Steenland, Jr., Atty. Dept. of Justice, Washington, D.C., was on the brief, for respondents.
 
 
 1
 James S. Dillman, Atty., F.A.A., Washington, D.C., was on the brief for respondent FAA.
 
 
 2
 Donald T. Bliss, Washington, D.C., with whom Carl R. Schenker, Jr., Washington, D.C., and Robert S. Harkey, Atlanta, Ga., were on the brief for intervenors Delta Air Lines, Inc. and American Airlines, Inc.
 
 
 3
 Jeffrey A. Manley, Washington, D.C., was on the brief for intervenor Transamerica Airlines, Inc.
 
 
 4
 Joel Stephen Burton, Alfred J. Eichenlaub, Robert L. Deitz, Ira T. Kasdan, Washington, D.C., and Lawrence M. Nagin, Los Angeles, Cal., were on the brief for intervenor The Flying Tiger Line, Inc. in Nos. 84-1654 and 84-1657.
 
 
 5
 Richard J. Kendall and Eileen M. Gleimer, Washington, D.C., were on the brief for intervenors Nat. Airlines, Inc., et al., in No. 84-1654.
 
 
 6
 Charles E. Doyle, Washington, D.C., was on the brief for U.S. Senator Nancy Landon Kassebaum, amicus curiae, supporting respondents.
 
 
 7
 Gary Keane, Dallas Fort Worth Airport, Tex., was on the brief for Dallas-Fort Worth Intern. Airport Bd., amicus curiae, supporting respondents.
 
 
 8
 Roy Nerenberg, George T. Volsky, Lawrence D. Wasko and Gary B. Garofalo, Washington, D.C., were on the brief for Airlift Intern., Inc., et al., amicus curiae, supporting respondents.
 
 
 9
 Before ROBINSON, Chief Judge, and TAMM and WALD, Circuit Judges.
 
 
 10
 Opinion for the court filed by Circuit Judge TAMM.
 
 TAMM, Circuit Judge:
 
 11
 These expedited cases raise a series of related questions concerning the appropriate administration of Federal Aviation Administration (FAA) authority to grant exemptions from 14 C.F.R. Sec. 91.303 (1984), a regulation that imposes noise standards on four-engine jet aircraft in commercial operations. Petitioners Carefree, Worldwide, and Tradewinds challenge as arbitrary and capricious the FAA denials of their petitions for exemptions from these standards. Petitioner Airmark challenges its partial exemption as being overly restrictive. Intervenors Delta Air Lines, American Airlines, Transamerica Airlines, and Flying Tiger Line argue that the FAA has no authority to grant exemptions and that, even if it has the authority, it has exercised that authority arbitrarily by granting a partial exemption to Airmark. We find that the FAA does have authority to grant exemptions. The agency's complete failure to apply consistent criteria in granting or denying exemptions, however, compels us to vacate its actions and remand for proceedings consistent with this opinion.
 
 I. BACKGROUND
 
 12
 In 1968 Congress enacted section 611 of the Federal Aviation Act, 49 U.S.C. Sec. 1431 (1982), granting the FAA broad authority to regulate aircraft noise. In response, the FAA promulgated a series of regulations addressing noise controls, in 1969, on future aircraft design,[1] in 1973, on future production of existing aircraft types,[2] and, in 1976, on aircraft currently in use.[3] The final regulations set a January 1, 1985 deadline for domestic operators to bring all four-engine aircraft into compliance with the noise controls.
 
 
 13
 Congress addressed the aircraft noise problem again in the 1979 Aviation Safety and Noise Abatement Act ("ASNA"), Pub.L. No. 96-193, 94 Stat. 50 (1979). ASNA provided that the January 1, 1985 compliance date set by the FAA for domestic aircraft would also apply to foreign aircraft operating in the United States unless the International Civil Aviation Organization ("ICAO") adopted noise standards substantially compatible with the FAA regulations. 49 U.S.C. Sec. 2122 (1982). In the report accompanying ASNA, the Conference Committee encouraged the FAA to consider granting exemptions from the noise control compliance deadline in certain "hardship" situations:
 
 
 14
 [T]he FAA is urged to give consideration to hardship situations involving smaller carriers where the carrier is making a good faith compliance effort but needed technology is either delayed or unavailable and rigid adherence to compliance deadlines could work financial havoc and deprive the public of valuable airline service.[4]
 
 
 15
 In November 1980, after determining that the ICAO had not adopted standards similar to those in effect for domestic airlines, the FAA amended the noise regulations to apply the January 1, 1985 compliance date to aircraft in foreign commerce. 45 Fed.Reg. 79302, 79304 (Nov. 28, 1980). The FAA found that the language in the Committee Report provided the criteria that should be applied to exemptions from the 1985 compliance deadline. See id. at 79312. The FAA divides these criteria into five constituent factors: 1) the carrier's small size; 2) unavailability of technology for noise abatement; 3) the carrier's demonstrated good faith compliance effort; 4) financial havoc to the carrier if the regulation is strictly enforced; and 5) loss of valuable air service in the absence of an exemption.
 
 
 16
 Air carriers have had three ways in which to comply with the noise rules: (1) replacing noncompliant aircraft with compliant aircraft; (2) reengining noncompliant aircraft with newer, quieter engines; or (3) retrofitting engine nacelles and fan ducts with sound absorbing materials, or "hush kits." Most larger carriers chose to replace their noncompliant aircraft. The smaller air carriers now seeking exemptions chose instead to fit their aircraft with hush kits. Although Boeing Corporation developed the technology for hush kits in the early 1970s, it dropped the program in 1978 due to lack of carrier demand. The impending noise deadlines reawakened the hush kit industry in 1984; delivery on FAA certified kits, however, is not expected until later this year. Unable to comply with the noise regulations before the deadline, small carriers, including petitioners in this case, sought exemptions from the FAA. As of February 1985, the FAA had received 145 petitions seeking exemptions for 300 aircraft. The FAA has granted 15 exemptions under its general rulemaking authority,[5] all but two[6] on or after December 28, 1984.
 
 
 17
 A. Carefree Vacations, Inc. and Worldwide Airlines, Inc., No. 84-1654
 
 
 18
 Carefree has served as a charter tour operator based in Chicago for over ten years. From April through June 1984 Carefree acquired three noncompliant Boeing 707-331B aircraft. Worldwide Airlines, Inc., a subsidiary formed primarily to operate flights for Carefree, leases these aircraft from its parent. On December 31, 1984, one day before the January 1 deadline, Carefree entered into a contract to purchase a hush kit for one of its aircraft. Carefree also took an option for delivery of two other kits. Installation of the hush kits is expected in late 1985.
 
 
 19
 On March 30, 1984, Carefree and Worldwide (hereinafter "Carefree") petitioned the FAA for an exemption from the January 1985 deadline. In a June 5, 1984 order, the FAA denied the exemption, finding that it would be unfair to compliant airlines to grant Carefree an exemption since Carefree had acquired its aircraft knowing that it could not comply with the noise rules by January 1985. The FAA found that delay in the availability of hush kits did not justify granting an exemption because hush kit technology had been available for more than ten years. The FAA also saw no way to distinguish Carefree's financial burden in securing compliant aircraft from that of other operators who had expended the sums necessary to comply with the regulation.[7] On December 18, 1984, the FAA denied Carefree's petition for reconsideration.
 
 B. Tradewinds Airways, Ltd., No. 84-1657
 
 20
 Tradewinds Airways, a United Kingdom carrier, has provided all-cargo charter service, primarily to Chicago, since 1971 and has offered scheduled service since 1983. Tradewinds began operating its three noncompliant Boeing B-707 aircraft in 1978.[8] Tradewinds executed binding contracts for the purchase of two hush kits on September 7, 1984, and expects that the kits will be installed in April 1985.
 
 
 21
 On April 3, 1984, Tradewinds petitioned the FAA for an exemption. On August 9, 1984, the FAA denied the exemption in an order that in large part mirrored the Carefree denial. The FAA noted that Tradewinds' increased domestic schedule began in 1983, long after the noise restrictions were made applicable to foreign carriers. Since the technology for hush kits had been available for ten years, the FAA was unmoved by Tradewinds' inability to have hush kits installed until April 1985.[9] On December 27, 1984, the FAA denied Tradewinds' petition for reconsideration.
 
 C. Airmark Corporation, No. 84-1619
 
 22
 Airmark is a United States charter carrier, operating a Boeing B-707 specially configured for use by corporate executives, foreign officials, and entertainers. Airmark purchased its aircraft in 1983 and began operations in August 1984. On July 6, 1984, Airmark contracted for installation of a hush kit, with a delivery date of May 31, 1985.
 
 
 23
 Airmark petitioned for exemption on April 2, 1984. The FAA's denial, dated June 5, 1984, parallels the Carefree and Tradewinds orders. Like Carefree, Airmark purchased its aircraft knowing that it would not comply with the FAA's noise rules; the FAA again noted that the unavailability of hush kits was no basis for exemption.[10] The FAA denied Airmark's petition for reconsideration on December 18. On December 28, however, the FAA sua sponte granted a partial exemption, stating that "the situation has changed."[11] The FAA found that Airmark's purchase of a hush kit contract was indeed evidence of good faith. Moreover, since Airmark would be forced to cease operations without the exemption, it had shown the necessary "financial havoc." The exemption contains significant restrictions: the exemption applies only until the expected installation date of the hush kits, a curfew is imposed, and Airmark may only operate at the airports it served in 1984. Airmark claims that these restrictions upon its unique charter service render the partial grant equivalent to an outright denial.
 
 II. DISCUSSION
 
 24
 The many issues raised in these cases fall into two broad categories. In Part A we address petitioners' and intervenors' contentions concerning the FAA's general authority to grant exemptions from the noise regulations. In Part B we address the claims that the FAA has arbitrarily applied different decisional criteria to similarly situated carriers.
 
 A. The FAA's Authority to Grant Exemptions
 
 25
 The FAA has the power to grant exemptions from its regulations if "such action would be in the public interest." 49 U.S.C. Sec. 1421(c) (1982). Petitioners contend that the Federal Aviation Act compels the FAA to adopt a more lenient exemption policy. Intervenors argue that legislation enacted after the noise rules were promulgated limits the FAA's authority to grant exemptions to the most exceptional circumstances. We find both of these arguments without merit.
 
 
 26
 Petitioners contend that the FAA's noise policy, as reflected in its regulations and exemption criteria, must be relaxed to conform to presently available technology. This argument rests on language in section 611 of the Federal Aviation Act, which states that in prescribing and amending noise regulations, the FAA shall "consider whether any proposed standard or regulation is economically reasonable, technologically practicable, and appropriate for the particular type of aircraft ... to which it will apply." 49 U.S.C. Sec. 1431(d)(4) (1984). See Brief for Carefree at 16-8; Brief for Tradewinds at 16 n. 6; Brief for Airmark at 12. Petitioners contend that continued adherence to the January 1, 1985 deadline is technologically impracticable because hush kits are not yet commercially available and economically unreasonable because it results in the grounding of their noncompliant aircraft.
 
 
 27
 We find nothing in section 611 that compels the FAA to adjust the deadline due to the current unavailability of hush kits. The FAA has already determined the economic reasonableness and technological practicability of its noise regulations. There is no serious contention that this original determination was flawed. By setting the deadline eight years in advance, the FAA in 1976 sought to force the industry to develop commercially available hush kits.[12] The FAA reasonably concluded that the absence of a deadline perceived by the industry as firm would perpetuate the sluggish development of the hush kit industry. Indeed the demand created by the deadline has spurred the industry, albeit belatedly, into developing hush kits which should be available within the next year. To require the FAA to reevaluate its deadline would erode the foundation of its regulations. Industry would not develop the needed technology if it could anticipate either periodic adjustments of deadlines to reflect the anticipated availability of noise reduction technology or individual exemptions based solely upon a particular carrier's inability to comply with the regulations without suffering what it perceives as unreasonable economic harm.[13]
 
 
 28
 For their part, intervenors contend that two pieces of legislation enacted after the FAA promulgated the initial noise rules prove that Congress did not intend the FAA to "exempt four-engine aircraft absent extraordinary and unanticipated circumstances not presented in the cases under review."[14] First, the version of ASNA passed by the Senate included a provision that would have permitted the FAA to grant exemptions for "good cause."[15] The Conference Committee's exclusion of this language, intervenors contend, reflects a congressional intent to preclude the FAA from granting any exemptions. We reject this contention. Had the conferees intended by that deletion to effect a repeal of the FAA's existing authority, they would have expressed that intention in the clearest of terms. See Watt v. Alaska, 451 U.S. 259, 267, 101 S.Ct. 1673, 1678, 68 L.Ed.2d 80 (1981) (repeal by implication is disfavored). Instead, the legislative history suggests that the conferees considered the good cause language unnecessary because the FAA already had authority to grant exemptions.[16] Furthermore, the conferees in the Committee Report explicitly urged the FAA to grant exemptions in "hardship situations."[17]
 
 
 29
 Second, intervenors contend that 1984 legislation granting specific exemptions for Miami and Bangor International Airports[18] proves the lack of FAA general exemption power. Again, the legislative history of the Miami-Bangor legislation reveals that by enacting these specific exemptions, Congress intended to leave the FAA's general exemption authority intact.[19]
 
 
 30
 We therefore conclude that 1) section 611 does not compel the FAA to grant exemptions from the noise regulations merely because hush kits are currently commercially unavailable, and 2) neither ASNA nor the Miami-Bangor legislation either expressly or implicitly circumscribes the FAA's authority to grant exemptions under the section 601(c) public interest standard. In short, the FAA has broad discretion to determine whether the public interest would or would not be served by granting noncompliant carriers exemptions from the noise regulations.
 
 
 31
 B. The FAA's Exercise of Exemption Authority
 
 
 32
 Having established that the FAA has broad authority to grant or deny exemptions, we now consider whether the FAA has exercised that authority in an arbitrary and capricious fashion. Under this familiar standard, "[t]he scope of review ... is narrow and a court is not to substitute its judgment for that of the agency." Motor Vehicle Manufacturers Ass'n, Inc. v. State Farm Mutual Automobile Insurance Co., 463 U.S. 29, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). Deference to agency authority or expertise, however, "is not a license to ... treat like cases differently." United States v. Diapulse Corporation, 748 F.2d 56, 62 (2d Cir.1984). See also Local 777, Democratic Union Organizing Committee v. NLRB, 603 F.2d 862, 872 (D.C.Cir.1978). As the FAA recognizes, "the agency [has] no choice but to apply the same criteria to all airlines petitioning for exemptions. Any other policy would fly in the face of Congress' intent that air carriers be treated even-handedly." Brief for FAA, Carefree Vacations, at 12. We recognize, of course, that "an agency is free to alter its past rulings and practices even in an adjudicatory setting." Hatch v. FERC, 654 F.2d 825, 834 (D.C.Cir.1981). Nevertheless, "it is equally settled that an agency must provide a reasoned explanation for any failure to adhere to its own precedents." Id. At the very least, "an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from tolerably terse to intolerably mute." Greater Boston Television Corp. v. FCC, 444 F.2d 841, 852 (D.C.Cir.1970) (citations omitted), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). Petitioners and intervenors alike (although with different objectives) contend that the FAA has arbitrarily applied different decisional criteria to similarly situated carriers. We agree.
 
 
 33
 The FAA's application of the exemption criteria can only be described as grossly inconsistent and patently arbitrary. Elementary even-handedness requires that if all five factors must be met by one petitioner, then all five factors must be met by the next. This has not been the FAA's practice. For example, in an exemption denial issued on December 13, 1984, the FAA unequivocally stated that "all five factors must be met by a petitioner in each case."[20] Yet the "valuable air service" requirement, a factor that the FAA repeatedly asserts on appeal is essential,[21] was not even mentioned in the January 4 grant of an exemption to Ports of Call Travel Club,[22] the December 28 grant of an exemption to Airmark Corporation,[23] or the December 28 grant of an exemption to Buffalo Airways.[24] The latter airlines received exemptions in undeniable contravention of the rule that all five factors must be met in each case.[25]
 
 
 34
 Another critical inconsistency appears in the FAA's determinations of what constitutes a "good faith compliance effort." Before December 1984, the FAA stated repeatedly that the mere negotiation of a hush kit contract would not satisfy the requirement of a good faith effort to comply with the noise regulation.[26] On December 27, however, in denying a reconsideration of Tradewinds' petition, the FAA recognized that the execution of hush kit contracts "does represent some evidence of a good faith compliance effort."[27] One day later the FAA concluded that "the situation [had] changed" to the extent that a hush kit contract conclusively established good faith. In its sua sponte reconsideration of Airmark's petition for exemption, the FAA found "that petitioner has made significant, good faith compliance efforts" by entering into a firm contract to purchase a hush kit.[28] The FAA might argue that circumstances had "gradually" changed between November, when the execution of a hush kit contract did not indicate good faith compliance, December 27, when the execution of a hush kit contract was "some evidence" of good faith compliance, and December 28, when the applicant needed only to execute a hush kit contract to prove good faith. Even this post hoc rationalization, however, cannot explain the criteria applied in a December 28 denial of Skystar International's petition for exemption, in which the FAA stated: "the petitioner asserts that it is making a good faith compliance effort by contracting for hush kits for its aircraft. The FAA does not agree." Good faith was destroyed, the FAA reasoned, because "[p]etitioner obtained its aircraft with full knowledge that such aircraft could not be operated at U.S. airports on or after January 1, 1985."[29] By contrast, the FAA found that Airmark, which was granted a partial exemption the same day, demonstrated good faith by the execution of a hush kit contract despite the fact it too had purchased its noncompliant aircraft long after the FAA set the January 1, 1985 deadline.[30]
 
 
 35
 The FAA's exemption shell game is also displayed in its application of the "financial havoc" criterion. Before December 28, 1984, the FAA held that an airline would not meet the "financial havoc" criterion if the havoc was created by the airline's own doing, that is, by the airline's purchase of noncompliant aircraft after the regulations establishing the January 1, 1985 deadline went into effect. For example, in its August 30, 1984 denial of Surinam Airway's petition for exemption, the FAA stated that
 
 
 36
 all the information available in this petition indicates that petitioner is now confronting its present difficult situation entirely as a result of its own decision to acquire aircraft that do not meet the noise rule and which cannot now be modified in time to do so. Certainly, those drafting the Conference Report did not intend that financial 'havoc' of a petitioner's own making could justify an exemption.[31]
 
 
 37
 The FAA did not apply this reasoning, however, in granting Buffalo Airways a partial exemption on December 28, 1984. Buffalo did not even begin operations until 1984; yet, the financial havoc was somehow not of its own choosing, or, if it was of its own choosing, it was nonetheless enough to satisfy the criterion. In some cases, the FAA has ignored the "financial havoc" criterion altogether. In its January 18, 1985 grant of an exemption to Hawaiian Airlines, for example, the FAA did not even discuss whether the refusal of an exemption would result in any financial havoc.[32]
 
 
 38
 The FAA's arbitrary exemption process is vividly demonstrated in its treatment of the petitions from Tradewinds, Carefree, and, to a lesser extent, Airmark. In its August 9, 1984 denial of Tradewinds' petition, the FAA stated that it would be unfair to compliant operators to grant the exemption.[33] By January 1985, the FAA had found that a significant number of operators had invested the sums necessary to bring their fleets into compliance. Inexplicably, this widespread compliance did not make the unfairness rationale more compelling. Rather, it somehow led the FAA to ignore altogether the unfairness of granting exemptions.[34] In a January 4, 1985 grant of an exemption to Ports of Call, the FAA, citing the industry's increasing compliance with the noise regulations, stated the broad rule that "those operators which have demonstrated their firm commitment to modifying their aircraft to bring them into compliance, and which, if not granted limited exemptions, would be forced to stop operating, will be permitted to continue operating under certain restrictions until their aircraft can be modified."[35] In granting an exemption to Ports of Call, the FAA took an opposite view of the very considerations that had been fatal to Tradewinds' petition.
 
 
 39
 The June 5, 1984 denial of Carefree's petition contained the same reasoning found in its Tradewinds order: the grant of an exemption would be unfair to complying carriers, and the financial havoc facing Carefree was of its own doing. Yet, as shown above, in later orders granting exemptions to other operators, the FAA repeatedly ignored those considerations found dispositive in its denial of Carefree's petition.
 
 
 40
 Airmark, on the other hand, has been in large part a beneficiary of the FAA's inconsistent approach to considering petitions for exemptions. In granting Airmark a partial exemption, the FAA found that Airmark's purchase of a hush kit evidenced good faith, did not consider whether the impending financial havoc was of Airmark's own doing, and did not measure the value of the air service provided.[36] Airmark contends, however, that the curfew imposed on the exemption is inconsistent with other grants. We agree. Similar restrictions were not imposed on either Buffalo Airways[37] or Icelandair.[38] The FAA has offered no coherent explanation for this disparate treatment.
 
 III. CONCLUSION
 
 41
 Petitioners contend that they deserve exemptions and ask this court to order the FAA to grant full exemptions until the hush kits are installed on their aircraft. Intervenors would have us affirm the denial of exemptions to Tradewinds and Carefree and reverse the partial grant to Airmark. These requests assume, however, that this court can and must determine the correct exemption criteria that should be applied in these circumstances. It is for the FAA, however, and not this court, to determine the circumstances in which exemptions should be granted or denied. As shown above, the FAA has utterly failed to provide a consistent approach that would allow even a guess as to what the decisional criteria are or should be. As this court recently stated, "we have neither the expertise nor the authority to substitute our judgment for that of the agency and provide an explanation where the agency's path is entirely uncharted." International Brotherhood of Teamsters v. United States, 735 F.2d 1525, 1531 (D.C.Cir.1984). See also United States v. Diapulse Corp., 748 F.2d 56, 62 (2d Cir.1984).
 
 
 42
 Accordingly, we vacate the denial of exemptions to Carefree and Tradewinds[39] and the partial grant to Airmark. Petitioners shall have thirty days from the issuance of this opinion to reapply for exemptions. The stays currently in force for these petitioners shall be extended for these thirty days. Should the carriers file new petitions within this time period, the FAA shall have a reasonable time to determine whether the carrier should be granted or denied an exemption[40] and the stays will remain in effect until 10 days following the order of the FAA.
 
 
 43
 We will not prescribe particular criteria for the FAA to apply; the FAA retains broad discretion to determine whether the public interest will be best served by granting or denying petitions. We must insist, however, that the FAA act upon the petitions in a consistent manner and that any deviation from prior rulings be carefully reasoned and fully explained.
 
 
 44
 So Ordered.
 
 
 
 [1]
 34 Fed.Reg. 18,355 (Nov. 18, 1969)
 
 
 [2]
 38 Fed.Reg. 29,569 (Oct. 26, 1973)
 
 
 [3]
 41 Fed.Reg. 56,046 (Dec. 23, 1976). These regulations created three classes or "stages" of aircraft. Stage 1 aircraft are those that were "type certificated" before 1969, manufactured before January 1, 1974, and were not subject to any noise requirements at the time of certification. These include the B-707s involved in the present cases, many of which were produced during the late 1950s and the 1960s. Stage 2 aircraft are those type certificated after 1969 or built after December 31, 1974, which must conform to the first mandatory noise standards issued by the FAA. In this category are B-747s, DC-9s, DC-10s, B-727s, and B-737s. Stage 3 aircraft are those for which applications for type certificates were made after November 5, 1975, which must meet the lowest noise levels that have, so far, become technologically practicable. The B-757s and B-767s are typical of this group
 
 
 [4]
 H.R.REP. NO. 715, 96th Cong., 1st Sess. 23, reprinted in 1980 U.S. CODE CONG. & AD.NEWS 89, 115, 124
 
 
 [5]
 The FAA has also granted 25 exemptions under legislation passed by Congress in 1984 granting specific relief for carriers serving Miami and Bangor Airports. Pub.L. No. 98-473, Sec. 124, 98 Stat. 1837, 1970 (1984) (the Miami-Bangor legislation)
 
 
 [6]
 Icelandair, FAA Docket No. 24,135 (Nov. 20, 1984); Caribbean Air Cargo Co., FAA Docket No. 24,288 (Nov. 30, 1984)
 
 
 [7]
 Carefree Vacations, Inc., FAA Docket No. 23,956 (June 5, 1984)
 
 
 [8]
 Tradewinds leases two of these planes from Greyhound Equipment Finance, Ltd., and owns the third. Currently, Tradewinds operates only one of the planes in the United States. Another will be used in the United States as soon as maintenance work is completed
 
 
 [9]
 Tradewinds Airways, Ltd., FAA Docket No. 23,992 (Aug. 9, 1984)
 
 
 [10]
 Airmark Corporation, FAA Docket No. 23,978 (June 5, 1984)
 
 
 [11]
 Airmark Corporation, FAA Docket No. 23,978 (Dec. 28, 1984)
 
 
 [12]
 This policy accords with congressional intent. In originally enacting section 611, Congress intended that the FAA impose "standards which require the full application of noise reduction technology." S.REP. NO. 1353, 90th Cong., 2d Sess., reprinted in 1968 U.S.CODE CONG. & AD.NEWS 2688, 2690. See also Sierra Club v. Costle, 657 F.2d 298, 364 (D.C.Cir.1981) (holding that the EPA has the authority under the Clean Air Act "to hold the industry to a standard of improved design")
 
 
 [13]
 Petitioners Carefree and Airmark also contend that because the FAA has adopted a new "no exemption" policy, it must initiate a new rulemaking proceeding. The FAA does not have a "no exemption" policy--it has granted at least fifteen exemptions from the noise regulations. At any rate, Carefree and Airmark have petitioned the FAA for a rulemaking, and the FAA has yet to act on the petition. Hence, the issue is not ripe for adjudication. See infra note 25 (addressing similar claims by intervenors Delta and American Airlines)
 
 
 [14]
 Brief for Intervenor Transamerica Airlines, Inc. at 32. The intervenors do not speculate what circumstances would warrant exemption under this test
 Intervenor Flying Tiger Line, Inc. ("Tiger") argues that the FAA has no authority whatsoever to grant exemptions to the noise regulations. It claims that the FAA adopted the regulations pursuant to the Aviation Safety and Noise Abatement Act of 1979. The source of the FAA's authority to grant exemptions, section 601(c) of the Federal Aviation Act, refers only to regulations "prescribed under this title," that is, Title VI. See 49 U.S.C. Sec. 1421(c) (1982). Since the ASNA legislation is not a part of Title VI, Tiger argues, the exemption power granted by section 601(c) does not reach the regulations promulgated thereunder. This argument is easily disposed of since it is inconsistent with the language of the regulations themselves: the preamble states clearly that "[t]hese amendments are adopted under Sec. 611 of the Federal Aviation Act," 45 F.R. 79,302 (Nov. 28, 1980), that is, under Title VI.
 
 
 [15]
 S. 413, 96 Cong., 1st Sess. Sec. 303, 125 CONG.REC. 9181, 9183 (1979)
 
 
 [16]
 See Aviation Safety and Noise Abatement: Hearings on H.R. 2458, H.R. 3547 and H.R. 3596 before the Subcomm. on Aviation of the House Comm. on Public Works and Transportation, 96th Cong., 1st Sess. 112-13 (Apr. 24, 1979) (testimony of FAA Administrator Bond) (indicating that "good cause" provision was unnecessary)
 
 
 [17]
 H.R.REP. NO. 715, 96th Cong., 1st Sess. 23, reprinted in 1980 U.S.CODE CONG. & AD.NEWS 89, 124, quoted supra text at note 4
 
 
 [18]
 In Pub.L. No. 98-473, Sec. 124, 98 Stat. 1837, 1970 (1984), Congress specifically directed the FAA to grant exemptions to those carriers operating at Miami and Bangor International Airports who had entered into hush kit contracts
 
 
 [19]
 See 130 CONG.REC. S13047 (daily ed. Oct. 3, 1984) (statement of Senator Baker) ("[I]t is my understanding that the provision temporarily exempting Miami International Airport ... is in no way intended to inhibit the Secretary of Transportation from granting exemptions in similar situations."); 130 CONG.REC. S14214 (daily ed. Oct. 11, 1984) (statement of Senator Hawkins) ("[N]othing in the exemption we have provided in any way effects [sic] the broad authority the Secretary possesses to grant exemptions from this or any other regulation at other places or under other circumstances from those specified in the amendment.")
 
 
 [20]
 Rich International Airways, Inc., FAA Docket No. 24,231 (Dec. 13, 1984). See also Skystar International, Inc., FAA Docket No. 24,308 (Dec. 28, 1984) ("all five factors mentioned in the report must be considered in each case")
 
 
 [21]
 Brief for FAA, Carefree Vacations, at 5, 6, 23
 
 
 [22]
 Ports of Call Travel Club, Inc., FAA Docket Nos. 24,055 and 24,357 (Jan. 4, 1985)
 
 
 [23]
 Airmark, Inc., FAA Docket No. 23,978 (Dec. 28, 1984). The Airmark order should be compared with a denial of an exemption issued the same day. See Aeroservicios Ecuatorianos, C.A., FAA Docket No. 24,230 (Dec. 28, 1984) ("all five factors mentioned must be considered in each case")
 
 
 [24]
 Buffalo Airways, Inc., FAA Docket No. 24,289 (Dec. 28, 1984). See also Rich International Airways, Inc., FAA Docket No. 24,231 (Jan. 4, 1985) (in granting a partial exemption, FAA did not even mention the value of the service to the public)
 
 
 [25]
 The FAA concedes that it no longer takes all five considerations into account. It claims that it has fine tuned the test and no longer considers whether the carrier is small or whether the needed technology is unavailable because all applicants are small and all face the same availability problems. Brief for FAA, Carefree Vacations, at 5. That all the applicants face the same availability problems does not mean, however, that the "unavailability of technology" criterion is met in every case. In a December 28, 1984 exemption denial, the FAA stated that since hush kits were "commercially available long ago," the petitioner did not meet the "unavailability of technology" criterion. Aeroservicios Ecuatorianos, FAA Docket No. 24,230 (Dec. 28, 1984). If the FAA had consistently applied the Aeroservicios Ecuatorianos precedent, perhaps no applicant would ever have qualified for an exemption. The Aeroservicios order can be distinguished on other grounds. As we discuss below, however, the FAA no longer requires that the applicant meet both the "financial havoc" and "valuable air service" factors, and it has drastically redefined "good faith." The FAA's dogged insistence that it has done no more than fine tune the test is eloquent proof of the petitioners' claim that the FAA has casually ignored its own precedent. See Columbia Broadcasting System, Inc. v. FCC, 454 F.2d 1018, 1026 (D.C.Cir.1971) ("when an agency decides to reverse its course, it must provide an opinion or analysis indicating that the standard is being changed and not ignored, and assuring that it is faithful and not indifferent to the rule of law")
 Intervenors Delta and American seize on this apparent change of policy and urge this court to require the FAA to initiate new rulemaking proceedings. The decision whether to proceed by rulemaking or adjudication, however, is within the sound discretion of the agency. See New York State Commission on Cable Television v. FCC, 749 F.2d 804, 815 (D.C.Cir.1984). Moreover, as noted supra note 13, the FAA has yet to act on petitions for rulemaking from Airmark and Carefree.
 
 
 [26]
 See, e.g., Surinam Airways, Ltd., FAA Docket No. 23,987 (Aug. 30, 1984) (although hush kits were being prepared for its noncompliant aircraft, the petitioner's actions did not bespeak "good faith compliance effort"). But see Caribbean Air Cargo, Ltd., FAA Docket No. 24,288 (Nov. 30, 1984) (partial grant of exemption--hush kit contract "strong indication of good faith compliance effort")
 
 
 [27]
 Tradewinds, Inc., FAA Docket No. 23,992 (Dec. 27, 1984) (emphasis added)
 
 
 [28]
 Airmark Corporation, FAA Docket No. 23,978 (Dec. 28, 1984). See also Arrow Air Inc., FAA Docket No. 24,186 (Dec. 28, 1984) (same)
 
 
 [29]
 Skystar International, Inc., FAA Docket No. 24,308 (Dec. 28, 1984)
 
 
 [30]
 See also Buffalo Airways, Inc., FAA Docket No. 24,289 (Dec. 28, 1984). In Buffalo, the FAA granted a partial exemption, stating that the operator's contract for a hush kit established good faith. Buffalo Airways, however, did not even begin operations until January 6, 1984, over seven years after the FAA established the January 1, 1985 deadline. This partial grant should be compared with the December 18, 1984 denial of Airmark's reconsideration, in which the Administrator of the FAA, Donald Engen stated "[t]he knowing acquisition of a noncomplying airplane less than 16 months before the compliance deadline does not constitute good faith compliance effort." Airmark, Inc., FAA Docket No. 23,978 (Dec. 18, 1984)
 
 
 [31]
 Surinam Airways, Inc., FAA Docket No. 23,987 (Aug. 30, 1984)
 
 
 [32]
 Hawaiian Airlines, Inc., FAA Docket No. 24,326 (Jan. 18, 1985)
 
 
 [33]
 Tradewinds Airways, Ltd., FAA Docket No. 23,992 (Aug. 9, 1984)
 
 
 [34]
 Instead of explaining how the overall compliance has changed the equities to favor those few which remain noncompliant, the FAA has offered only non sequiturs. In its December 28, 1984 grant of an exemption to Arrow Air, the FAA, citing the overall compliance with the noise regulations, concluded that granting the exemption would be in the public interest because it would "generate the income" necessary to bring the petitioner into compliance. Arrow Air, Inc., FAA Docket No. 24,186 (Dec. 28, 1984). The increasing compliance, however, has nothing to do with this new approach. An exemption from the burdensome noise regulations would help any carrier generate revenues, whether the carrier petitioned the FAA before "the situation had changed," as did Tradewinds and Carefree, or after. More significantly, however, because the revenue generation rationale applies to any carrier seeking an exemption from the noise regulations, it cannot meaningfully distinguish among applicants that seek specific exemptions from the general rule
 
 
 [35]
 Ports of Call Travel Club, FAA Docket Nos. 24,055 and 24,357 (Jan. 4, 1985)
 
 
 [36]
 Airmark Corp., FAA Docket No. 23,978 (Dec. 28, 1984)
 
 
 [37]
 Buffalo Airways, Inc., FAA Docket No. 24,289 (Dec. 28, 1984)
 
 
 [38]
 Icelandair, FAA Docket No. 24,135 (Nov. 20, 1984)
 
 
 [39]
 Because we vacate the FAA's denial of Tradewinds' petition, we need not address Tradewinds' argument, unique to its status as a foreign carrier, that the FAA has discriminated against it in violation of numerous international agreements. The consistent application of exemption criteria, which we today demand, to foreign and domestic carriers alike, should cure any perceived discriminatory treatment
 Tradewinds also argues that any denial of its exemption petition would contravene international obligations requiring that the United States recognize the "airworthiness" certificates of other signatory countries. Brief for Tradewinds at 69. See also 49 U.S.C. Sec. 1502 (1982) (requiring the FAA to exercise authority "consistently with any obligation assumed by the United States in any treaty"). As the FAA correctly notes, however, the noise regulations are not "airworthiness" rules dealing with aircraft safety, but "operating" rules which a country may impose on foreign aircraft.
 
 
 [40]
 Under the FAA's regulations governing actions on petitions for exemptions, 14 C.F.R. Sec. 11.27, summaries of the petitions are to be published in the Federal Register, allowing other parties 60 days to file comments in response thereto. The FAA may, however, establish different time periods for "good cause." Id