# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 12, 2006        Decided December 15, 2006

No. 05-1248

NUVIO CORPORATION,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

VERIZON TELEPHONE COMPANIES AND
AT&T CORPORATION,
INTERVENORS

Consolidated with
05-1345, 05-1346, 05-1347

On Petitions for Review of an Order of the
Federal Communications Commission

*Russell M. Blau* argued the cause for petitioners. With him on the briefs were *Richard M. Rindler* and *Joshua M. Bobeck.*

*James M. Carr*, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the

brief were *Peter D. Keisler*, Assistant Attorney General, U.S. Department of Justice, *Douglas N. Letter*, Appellant Litigation Counsel, *Scott R. McIntosh*, Special Counsel, *Samuel L. Feder*, General Counsel, Federal Communications Commission, and *Jacob M. Lewis* and *Daniel M. Armstrong*, Associate General Counsel. *John E. Ingle*, Deputy Associate General Counsel, and *Nandan M. Joshi*, Counsel, entered appearances.

*Michael E. Glover*, *Karen Zacharia*, *Leslie V. Owsley*, *Joseph R. Guerra*, *David L. Lawson,* and *Gary L. Phillips* were on the brief for intervenors AT&T Corporation and Verizon Telephone Companies. *David W. Carpenter* entered an appearance.

Before: GINSBURG, *Chief Judge*, and GRIFFITH and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH in which *Chief Judge* GINSBURG joins and *Circuit Judge* KAVANAUGH joins with the exception of footnote five.

Concurring opinion filed by *Circuit Judge* KAVANAUGH.

GRIFFITH, *Circuit Judge*: Petitioners, providers of the newly-emerging technology of Internet telephone service, challenge an order of the Federal Communications Commission ("Commission" or "FCC") that gave them only 120 days to do what is already required of providers of traditional telephone service: transmit 911 calls to a local emergency authority. We deny their consolidated petition for review[1] because we conclude

---

[1] Nuvio Corporation; Lightyear Network Solutions, LLC; Primus Telecommunications, Inc.; Lingo, Inc.; and i2 Telecom International, Inc. (collectively "petitioners") have all petitioned

that the Commission adequately considered not only the technical and economic feasibility of the deadline, inquiries made necessary by the bar against arbitrary and capricious decision-making, but also the public safety objectives the Commission is required to achieve.

## I.

One of the many dramatic changes the Internet has brought to telecommunications has been the development of interconnected Voice over Internet Protocol ("VoIP") service, which allows a caller using a broadband Internet connection to place calls to and receive calls from other callers using either VoIP or traditional telephone service. *E911 Requirements for IP-Enabled Service Providers*, First Report and Order and Notice of Proposed Rulemaking, 20 F.C.C.R. 10245, 10246 n.1 (2005) ("*Order*"). From a caller's perspective, interconnected VoIP service is, for the most part, similar to traditional telephone service, and its users reasonably expect it to function the same. But two additional capabilities of VoIP service undermine those expectations when callers try to use 911 emergency services. VoIP service allows callers to choose what are called "non-native" area codes. For example, a customer living in the District of Columbia can use an area code from anywhere in the country. Some interconnected VoIP providers ("IVPs") also offer "nomadic" service, which allows a VoIP telephone call to be made and received from wherever the user can establish a broadband connection. (By contrast, "fixed" VoIP telephone service can only be used from a dedicated, fixed connection—typically in a home or office.) As attractive as these two features may be, each makes it difficult for IVPs to provide the local callers the 911 emergency service they expect

---

for review.

and upon which they rely. Routers designed to direct 911 calls cannot recognize non-native area codes, and unlike traditional and wireless telephone service, there are no means yet available to easily determine the location of a caller using interconnected VoIP service. IVPs, which were not required to do otherwise, failed to use dedicated trunks (communications paths connecting two switching systems, used to establish an end-to-end connection) set aside for routing calls to a local emergency call center (known as a public safety answering point or "PSAP") and instead routed 911 calls to administrative lines that had not been designed and were not staffed to handle emergency calls. *Id.* at 10246 ¶ 1 n.2 (documenting various instances in which consumers were unable to contact emergency help after dialing 911 using an interconnected VoIP service). The resulting tragedies gave rise to the *Order* at issue.

The Commission, which had previously been reluctant to regulate this nascent industry for fear of hindering its development, *see, e.g.*, *IP-Enabled Services*, Notice of Proposed Rulemaking, 19 F.C.C.R. 4863, 4864 ¶ 1 (2004) ("*Notice of Proposed Rulemaking*" or "*NPRM*") (noting that IP-enabled services had developed "in an environment that is free of many of the regulatory obligations applied to traditional telecommunication services"), decided that an immediate solution was required to "discharge[] the Commission's statutory obligation to promote an effective nationwide 911/E911 emergency access system," *Order*, 20 F.C.C.R. at 10266 ¶ 36.[2] The Commission thus ordered that

---

[2] E911 is a more advanced version of the traditional 911 system, which merely routes an emergency call to the local PSAP, because it provides additional information about the caller:

within 120 days of the effective date of this Order,[3] an interconnected VoIP provider must transmit all 911 calls, as well as a call back number and the caller's "Registered Location" for each call, to the PSAP, designated statewide default answering point, or appropriate local emergency authority that serves the caller's Registered Location.

*Id.* ¶ 37 (citations omitted).

In effect, the *Order* requires that all IVPs, including those that offer nomadic service using non-native area codes, ensure that their users are able to reach local emergency services when making 911 calls. To do so, IVPs must route all 911 calls using the technology known as Automatic Number Identification ("ANI") or pseudo-ANI, if necessary. ANI "identifies the

E911 systems route 911 calls through the use of a Selective Router to a geographically appropriate PSAP based on the caller's location. E911 also provides the call taker with the caller's call back number, referred to as Automatic Numbering Information (ANI), and, in many cases, location information—a capability referred to as Automatic Location Identification (ALI).

*Order*, 20 F.C.C.R. at 10251 ¶ 13 (citations omitted).

[3] This *Order* became effective on July 29, 2005, *see* 70 Fed. Reg. 43,323, 43,323 (July 27, 2005) (to be codified at 47 C.F.R. § 9.5), thereby requiring compliance by November 28, 2005, *id.*

calling party and may be used as a call back number." 47 C.F.R. § 20.3. A pseudo-ANI is "[a] number, consisting of the same number of digits as ANI, that is not a North American Numbering Plan telephone directory number and may be used in place of an ANI to convey special meaning." *Id.* Because local selective routers are not capable of delivering non-native numbers to a local PSAP, pseudo-ANIs are used to temporarily mask the true number with a local number to facilitate processing by the local selective router for delivery to the PSAP. *See id.* The Commission was less stringent in requiring the use of Automatic Location Information (ALI), which provides an emergency dispatcher with the geographic location of the caller, because it is not yet technologically feasible to detect automatically the location of nomadic VoIP callers. The *Order* only requires, therefore, that IVPs ensure that 911 calls are routed to the *registered* and not the *actual* location of each 911 caller. *See Order*, 20 F.C.C.R. at 10271 ¶ 46. IVPs, however, must provide a way for consumers to update their registered locations in a timely fashion. *See id.* These interconnected IVP 911 calls must also be routed through the Wireline E911 network.[4] *See id.* at 10269 ¶ 40.

The Commission did not dictate a specific manner for IVPs to provide E911 access. Instead, the Commission noted that IVPs could satisfy these requirements by interconnecting directly with the E911 network through incumbent local

---

[4] "The core of the existing wireline E911 network is a dedicated, redundant, highly reliable wireline network (Wireline E911 Network), which is interconnected with but largely separate from the PSTN [public switched telephone network]." *Order*, 20 F.C.C.R. at 10251 ¶ 14. This network is generally implemented and operated by incumbent local exchange carriers ("ILECs"). *Id.*

exchange carriers ("ILECs"), *see id.* at 10268 ¶ 39, by interconnecting indirectly through a third party, *see id.* at 10267 ¶ 38, or by any other solution that results in E911 access, *see id.* Finally, the *Order* requires that interconnected VoIP providers notify every customer, new and existing, about "the circumstances under which E911 service may not be available through the interconnected VoIP service or may be in some way limited by comparison to traditional E911 service." *Id.* at 10272 ¶ 48.

## II.

Under the Administrative Procedure Act, which governs our review of this challenge, petitioners' burden is to show that the *Order* is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *see* 5 U.S.C. § 706(2)(A). They rely upon three arguments to meet that burden. First, petitioners assert that the *Order*'s 120-day deadline for IVPs to provide E911 service to their users of nomadic, non-native VoIP service is an unexplained departure from the Commission's precedent made without adequate regard to economic and technological obstacles. Petitioners also fault the *Order* for requiring that IVPs connect to the Wireline E911 network but failing to impose a corresponding duty on ILECs to permit this connection. Finally, petitioners contend that the Commission did not give adequate notice of the substance of the *Order*. We consider these arguments in turn and find each wanting.

> A.  *The FCC decision to require all IVPs—including providers of nomadic, non-native VoIP service—to provide E911 access within 120 days.*

Petitioners assert that the Commission disregarded

record evidence that the 120-day deadline was not feasible because there was no demonstrated way to overcome the technical and practical obstacles to implement E911 for providers of nomadic, non-native VoIP service. But this argument fails in the face of substantial contrary record evidence that the nation's largest interconnected VoIP provider had already procured a technical solution to meet the deadline.[5] The Commission noted that Intrado, a third-party competitive local exchange carrier, was already prepared to offer a technological

---

[5] Our concurring colleague reads the *Order* to suggest that "the 911 requirement would be justified even if VoIP providers could not feasibly meet the 120-day deadline." Concurring Op. at [1-2]. But he quotes no language in the *Order* stating that, and we find none suggesting that. The *Order* makes reference to the Commission's statutory duty to consider safety, a factor that is an important element in our analysis, but we do not think these references can support the suggestion that the Commission has ever justified the 120-day deadline on the basis of any authority to ban VoIP service outright. We note that if such authority exists, the Commission has not clearly relied on it in its briefs or at oral argument. In fact, when asked to clarify whether the deadline was appropriate even if it was not feasible, counsel for the Commission replied, "No. No, Your Honor. The Commission believed that the deadline was aggressive, but that it was something that could be met, and it recognized the need to try to force these parties to get going, to get moving." Transcript of Oral Argument at 19, *Nuvio Corp. v. FCC*, No. 05-1248 (D.C. Cir. Sep. 12, 2006). Because we "cannot sustain [the Commission's] action on some other basis the [Commission] did not mention," *Point Park Univ. v. NLRB*, 457 F.3d 42, 50 (D.C. Cir. 2006) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196-97 (1946)), we need not consider whether safety concerns alone would justify the deadline.

solution that met the *Order*'s requirements, even for providers of nomadic, non-native service. *Order*, 20 F.C.C.R. at 10267 ¶ 38. At the time the *Order* was promulgated and in advance of the 120-day deadline, Intrado was already offering a service that "enables the delivery of a VoIP subscribers [sic] address and call back number to the most geographically relevant [PSAP] . . . , thereby accommodating the nomadic capability inherent in their VoIP service." Ex Parte Letter from M. Boyd, Intrado, to M.H. Dortch, FCC, WC Docket No. 04-36 (Apr. 25, 2005); *see also* Ex Parte Letter from M. Boyd, Intrado, to M.H. Dortch, FCC, WC Docket No. 04-36 (Apr. 19, 2005). Vonage, the nation's largest VoIP provider, agreed with Verizon, the ILEC controlling the Wireline E911 network in its territory, that it would use Intrado's service "to deliver both caller's location and call back number to emergency services personnel for 911 calls placed throughout Verizon's [28-state] territory," and would do so by November 4, before the November 28, 2005 deadline. Ex Parte Letter from W.B. Wilhelm, Vonage, to K.J. Martin, FCC, WC Docket No. 04-36 (May 9, 2005).

The Commission also relied on IVP trials that demonstrated E911 access was possible for providers of nomadic, non-native VoIP service. For example, Qwest and Vonage conducted a test of VoIP E911 access in King County, Washington. This test included both an experimental means of PSTN access and a messaging component used to deliver the calling party's location automatically. Petitioners' focus on the failed experimental access component ignores the successful messaging component of the trial that demonstrated VoIP E911 access was in fact possible. In recounting the results of this trial, Qwest noted that, rather than using this failed experimental access, an IVP could provide E911 service using a combination of Qwest's tarriffed access to the Wireline E911 network and

third party support services.[6]   Ex Parte Letter from C. O'Connell, Qwest, to M.H. Dortch, FCC, WC Docket No. 04-36 (Apr. 12, 2005).  Vonage had also successfully tested E911 access for nomadic VoIP in Newport, Rhode Island.  *See* Ex Parte Letter from W.B. Wilhelm, Vonage, to M.H. Dortch, FCC, WC Docket No. 04-36 (May 9, 2005).  Petitioners seize upon two elements of this Newport test to argue that it is an unreliable basis for the *Order*.  First, there is only one PSAP in small Rhode Island and so this test could not address the critical issue of routing calls to the wrong PSAP.  Second, the state and not an ILEC owns the selective router and so there is no issue of providing access to the E911 Wireline network.  Petitioners have no doubt identified elements in this test that provide some grounds to distinguish them from what the *Order* demands, but the general success of the Rhode Island test, combined with the substantial deference we owe the FCC's predictive judgments, overcomes the petitioners' objections.  *See, e.g.*, *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 821 (D.C. Cir. 1983) ("Predictive judgments about areas that are within the agency's field of discretion and expertise" are entitled to "particularly deferential" treatment.); *see also Charter Commc'ns, Inc. v. FCC*, 460 F.3d 31, 44 (D.C. Cir. 2006) ("That

---

[6]     To provide E911 connectivity for its "nomadic" VoIP users, the VoIP provider can purchase the dedicated access component in the form of Qwest's tarriffed E911 service and, in addition, they can purchase the E2 interface (the messaging component) from a VoIP Positioning Center provider.  This is consistent with the NENA I2 standard.

Ex Parte Letter from C. O'Connell, Qwest, to M.H. Dortch, FCC, WC Docket No. 04-36 (Apr. 12, 2005).

is a predictive judgment that the FCC is entitled to make and to which we defer.").

Petitioners' argument that the submission of the National Emergency Number Association ("NENA") undermines the Commission's conclusion that the 120-day deadline was reasonable also fails to account for the deference we give to an agency's predictive judgments. NENA opined that "the *bulk* of national access to [E911]" could be reached within 120 days, but noted that "[f]ull national access" could take "another 4-6 months." Ex Parte Letter from J.R. Hobson, NENA, to M. Dortch, FCC, WC Docket No. 04-36 (May 11, 2005) (emphasis added). The Commission was acting well within its authority to use its expertise to make predictive judgments when it concluded that if the "bulk of national access" could be achieved within 120 days, it was reasonable to use that time period.

We must also address the petitioners' claim that the Commission erred by failing to distinguish between the technological obstacles faced by nomadic or non-native VoIP providers and those faced by fixed, native providers. They allege the Commission based the *Order* on the technological capabilities associated with fixed VoIP service and overlooked the unique challenges posed by nomadic, non-native VoIP service. But the Commission in fact considered the unique technological challenges of nomadic VoIP, *see Order*, 20 F.C.C.R. at 10259 ¶ 25 (noting that "certain [nomadic or portable] VoIP services pose significant E911 implementation challenges"), and taking stock of those challenges, did not require that IVPs determine the *actual* location of nomadic VoIP users because it "is not always technologically feasible for providers of interconnected VoIP service to automatically determine the location of their end users without end users' active cooperation," *id.* at 10271 ¶ 46. Instead, the Commission determined that IVPs must provide only the *registered* location

of the nomadic VoIP user making a 911 call, *see id.*, and called for comment on the feasibility of automatically determining the geographic location of nomadic VoIP users, *see id.* at 10276-77 ¶¶ 56-57.

Petitioners' argument that the Commission overlooked the economic cost of implementing the *Order*'s 120-day deadline highlights that our task under the arbitrary or capricious standard is to determine only whether an agency's decision "'was based on a consideration of the relevant factors and whether there has been a clear error of judgment,'" *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Bowman Transp., Ind. v. Ark.-Best Freight System, Inc.*, 491 U.S. 281, 285 (1974)). Petitioners overlook a countervailing interest that the Commission must consider and we must respect—the threat to public safety. When, as is the case with the FCC, Congress has given an agency the responsibility to regulate a market such as the telecommunications industry that it has repeatedly deemed important to protecting public safety, the agency's judgments about the economic cost of its regulations must take into account its duty to protect the public. The Commission is required to consider public safety by both its enabling act, *see* Communications Act of 1934 § 1, 47 U.S.C. § 151 ("so as to make available, so far as possible . . . [a] world-wide wire and radio communication service with adequate facilities at reasonable charges . . . *for the purpose of promoting safety of life and property through the use of wire and radio communications*") (emphasis added), and the Wireless Communication and Public Safety Act of 1999 § 3, 47 U.S.C. § 615 ("shall encourage and support efforts by States to deploy comprehensive end-to-end emergency communications infrastructure and programs, based on coordinated statewide plans, including seamless, ubiquitous, reliable wireless telecommunications networks and enhanced wireless 9-1-1

service"). The Commission here weighed public safety against the economic cost of compliance with the *Order* and found that, "[w]hile 120 days is an aggressively short amount of time in which to comply with these requirements, *the threat to public safety if we delay further is too great* and demands near immediate action." *Order*, 20 F.C.C.R. at 10266-67 ¶ 37 (emphasis added).

Because the Commission has reasonably determined that nomadic, non-native VoIP E911 access is technologically feasible, any argument about the time period required for implementation is nothing more than a quarrel over relative costs and benefits. In this case, the Commission has weighed the cost of an "aggressive" implementation scheme—a 120-day deadline—against the cost in human lives, and found in favor of public safety. *See id.* at 10266 ¶ 36 ("We find that this requirement most appropriately discharges the Commission's statutory obligation to promote an effective nationwide 911/E911 emergency access system by recognizing the needs of the public safety community to get call back and location information and balancing those needs against existing technological limitations of interconnected VoIP providers."); *cf. Public Citizen v. Auchter*, 702 F.2d 1150, 1157 (D.C. Cir. 1983) ("Delays that might be altogether reasonable in the sphere of economic regulations are less tolerable when human lives are at stake."). We may not disturb its determination where, as here, the Commission has considered relevant factors and has articulated a reasoned basis for its conclusion. *See State Farm*, 463 U.S. at 42-43. When viewed in this light, we cannot agree that the 120-day deadline is arbitrary or capricious.

Petitioners' final challenge to the 120-day deadline is that it represents an unexplained departure from long-standing precedent. The precedent, so the argument goes, was established when the FCC gave more time for wireless and

satellite phones and other new technologies to implement 911 capabilities than the aggressive deadline it has imposed on the new VoIP telephone service market. Petitioners are right that an agency departing from precedent "must provide a principled explanation for its change of direction." *Nat'l Black Media Coalition v. FCC*, 775 F.2d 342, 355 (D.C. Cir. 1985); *see also Airmark Corp. v. FAA*, 785 F.2d 685, 692 (D.C. Cir. 1985). But surely different technologies may reasonably bear different regulatory burdens. It is not apparent to us that the regulation of satellite or wireless phones is clear precedent for the regulation of information technology service providers. No doubt each involves telephone communications, but the differences between satellite and wireless phone service on the one hand and VoIP service on the other are such that the Commission has previously refused to classify IP-enabled services as telecommunications carriers. We give deference to agency expertise used to distinguish its prior cases from present controversies. *See PPL Montana, LLC v. Surface Transp. Bd.*, 437 F.3d 1240, 1247 (D.C. Cir. 2006) ("[T]he [agency's] attempt to distinguish its prior cases, while terse, is entitled to deference." (quoting *Inland Lakes Mgmt., Inc. v. NLRB*, 987 F.2d 799, 805 (D.C. Cir. 1993))). Even if the Commission's regulatory approach to these other telecommunications services provided a precedent for VoIP service, the Commission provided a reasoned explanation for adopting a different approach by expressly noting that "the record indicates that the network components that have been developed to make wireless E911 possible can also be used for VoIP E911, which should make the implementation process simpler and far less expensive than the initial upgrades necessary for wireless E911." *Order*, 20 F.C.C.R. at 10274 ¶ 53; *see also* Ex Parte Letter from W.B. Wilhelm, Vonage, to K.J. Martin, FCC, WC Docket No. 04-36 (May 9, 2005) (stating that Vonage "does not anticipate that it will face the same issues that have made [wireless] E-9-1-1 such a daunting challenge").

Because petitioners acknowledge that some type of E911 regulation is necessary, *see* Petitioners' Br. at 19, this petition for review is, in essence, a challenge only to where the FCC has drawn the regulatory "line," and we have previously and repeatedly given the Commission "wide discretion to determine where to draw administrative lines." *AT&T Corp. v. FCC*, 220 F.3d 607, 627 (D.C. Cir. 2000). Based on the record evidence, the demonstrated safety concerns, and our deference to the Commission's predictive judgments, we conclude that the *Order*'s 120-day deadline was neither arbitrary nor capricious.

B. *The FCC requirement for IVP connectivity to the Wireline E911 network without a corresponding obligation on ILECs.*

The *Order* requires IVPs to utilize the Wireline E911 network generally owned by the ILECs, but it failed to impose a duty on ILECs to provide that access. Petitioners argue that this different treatment of the ILECS was error. We find no error for the simple reason that the record contained evidence that major ILECs were cooperating with nomadic IVPs and "increasingly offering E911 solutions that allow VoIP providers to interconnect directly to the Wireline E911 network through tariff, contract, or a combination thereof." *Order*, 20 F.C.C.R. at 10268 ¶ 39. There is record evidence, for example, that Qwest, Bellsouth, and Verizon were cooperating with IVPs to provide access to the Wireline E911 network. *See, e.g.*, Ex Parte Letter from C. O'Connell, Qwest, to M.H. Dortch, FCC, WC Docket No. 04-36 (Apr. 12, 2005); Ex Parte Letter from B.L. Ross, Bellsouth, to M.H. Dortch, FCC, WC Docket No. 04-36 (May 12, 2005); Ex Parte Letter from K. Grillo, Verizon, to M.H. Dortch, FCC, WC Docket No. 04-36 (May 11, 2005). Although there is some evidence to suggest that a few ILECs were not always cooperative, *see* Petitioners' Reply Br. at 10 n.15, there was ample evidence of significant and increasing ILEC cooperation

with IVPs and, in the Commission's view, that cooperation removed any need to impose a duty upon ILECs to permit connectivity. That is a judgment we wisely leave alone as "predictions regarding the actions of regulated entities are precisely the type of policy judgments that courts routinely and quite correctly leave to administrative agencies," *Public Util. Comm'n of State of Cal. v. FERC*, 24 F.3d 275, 281 (D.C. Cir. 1994).

## C.    *The FCC's notice and comment procedures.*

Petitioners' final argument faults the Commission because the *Notice of Proposed Rulemaking* that led to the *Order* lacked proposed rules or even tentative conclusions. The APA requires notice of "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). "Since the public is generally entitled to submit their views and relevant data on any proposals, the notice must be sufficient to fairly apprise interested parties of the issues involved, but it need not specify every precise proposal which [the agency] may ultimately adopt as a rule." *Action for Children's Television v. FCC*, 564 F.2d 458, 470 (D.C. Cir. 1977) (internal quotation marks and citations omitted). The Commission fairly apprised the parties and the public of the issues covered by the *Order*. In our view, the Commission notified the parties of the purpose, *see NPRM*, 19 F.C.C.R. at 4900 ¶ 56 ("how best to achieve our policy objectives for ensuring the availability of 911 and E911 capability"), the extent, *see id.* ("the effectiveness of alternatives to direct regulation"), the form, *see id.* at 4901 ¶ 56 ("technological flexibility so that our rules allow for the development of new and innovative technologies"), and the time frame, *see id.* ¶ 57 ("time frame in which we should consider 911 and E911 regulatory issues in the IP context") of any potential regulation. The *NPRM* gave "interested parties a reasonable opportunity . . . to present relevant information" on the central

issues. *WJG Tel. Co. v. FCC*, 675 F.2d 386, 389 (D.C. Cir. 1982) (internal quotation marks and citations omitted). Indeed, many of the parties submitted comments on all aspects of VoIP access.

## III.

For the foregoing reasons, the petition for review is denied.

*So ordered.*

KAVANAUGH, *Circuit Judge*, concurring: In 2005, the Federal Communications Commission required voice-over-Internet-protocol (VoIP) providers to ensure adequate 911 connections – a requirement already imposed on wireline and wireless telephone providers. The FCC set a 120-day deadline for the VoIP providers to meet the requirement. *See* Order, 20 F.C.C.R. 10,245 (2005). The Court upholds the Order because the Commission reasonably predicted that VoIP providers (including nomadic VoIP providers) could meet the 120-day deadline and the Order was otherwise justified and explained. I agree with the Court's analysis and join its opinion.

The FCC also candidly recognized, however, the potential difficulties that nomadic VoIP providers would face in meeting a 120-day deadline – and acknowledged that the deadline was "aggressively short." *Id.* at 10,266-10,267 ¶ 37; *see also id.* ¶ 25 ("[W]e recognize that certain VoIP services pose significant E911 implementation challenges."). The FCC nonetheless said that "the threat to public safety if we delay further is too great and demands near immediate action." *Id.*; *see also* FCC Brief at 31 ("[T]he FCC made a reasonable judgment that any possible risk that expedited 911 implementation posed to [VoIP providers'] commercial viability was outweighed by the growing threat to public safety if [VoIP providers] continued to route 911 calls in a systematically unsatisfactory manner."); *id.* at 26 ("Given the tragedies that have already resulted from inadequate VoIP 911 service, and given the projected tenfold increase in the number of VoIP 911 calls in the near future, the Commission reasonably concluded that the public could not tolerate any further delay in the implementation of VoIP E911 service."); *id.* ("[G]iven the profound public safety concerns weighing in favor of rapid 911 deployment here, petitioners have not come close to showing that the balance struck by the Commission was unreasonable.").

I write separately only to express my agreement with the FCC Order's suggestion that the 911 requirement would be

justified even if VoIP providers could not feasibly meet the 120-day deadline. In my judgment, the FCC possesses the statutory authority, which the Commission may reasonably choose to exercise, to address the public safety threat by banning providers from selling voice service until the providers can ensure adequate 911 connections. And the FCC's greater authority to ban sales of voice service without adequate 911 capability necessarily includes the lesser power to ban such sales beginning in 120 days.

Congress established the FCC in part "for the purpose of promoting safety of life and property through the use of wire and radio communications." 47 U.S.C. § 151. Through the Wireless Communications and Public Safety Act of 1999, Congress charged the FCC with ensuring that 911 service is available throughout the country. Pub. L. No. 106-81, 113 Stat. 1286 (codified at scattered sections of 47 U.S.C.). The Act instructs that "[t]he Commission . . . shall designate 9-1-1 as the universal emergency telephone number within the United States for reporting an emergency to appropriate authorities and requesting assistance." 47 U.S.C. § 251(e)(3). Five years later, Congress enacted the ENHANCE 911 Act. Pub L. No. 108-494, 118 Stat. 3986 (2004) (codified at 47 U.S.C. § 942). In that Act, Congress found that "for the sake of our Nation's homeland security and public safety, a universal emergency telephone number (911) that is enhanced with the most modern and state-of-the-art telecommunications capabilities possible should be available to all citizens in all regions of the Nation." *Id.* § 102. Congress made clear that "enhanced 911 is a high national priority." *Id.*

As these statutes indicate, as the FCC has recognized in prior orders, and as the record before the Commission in this proceeding demonstrates, 911 service saves lives and helps prevent or reduce injuries that occur as a result of violent crime

or accidents. *See, e.g.*, Revision of the Commission's Rules to Ensure Compatibility with Enhanced 911 Emergency Calling Systems, 11 F.C.C.R. 18,676, 18,679 ¶ 5 (1996) (911 service "saves lives and property"); Order, 20 F.C.C.R. at 10,246 ¶ 1 n.2 (describing recent incidents involving home burglary and where children needed immediate help); *id.* at 10,248 ¶ 4 n.11 (citing comments that explain why 911 service is critical and that describe various incidents involving 911 service); Revision of the Commission's Rules to Ensure Compatibility with Enhanced 911 Emergency Calling Systems, 17 F.C.C.R. 8481, 8482 ¶ 4 (2002) (considering 911 issues for victims of domestic violence).

Adequate 911 service is important, moreover, for our Nation to quickly respond to terrorist attacks or natural disasters. *See* Order, 20 F.C.C.R. at 10,247-10,248 ¶ 4 ("911 service is critical to our nation's ability to respond to a host of crises"); *id.* at 10,249 ¶ 6 n.16 (citing DALE N. HATFIELD, A REPORT ON TECHNICAL AND OPERATIONAL ISSUES IMPACTING THE PROVISION OF WIRELESS ENHANCED 911 SERVICES (2002)); HATFIELD REPORT at ii ("the tragic events of September 11, 2001 and growing dependence on wireless networks[] serve to further emphasize the importance of E911 in general, and wireless E911 in particular, to the safety of life and property and homeland security"); *id.* at 15 (timely response to call of suspicious activity "could make the difference between a foiled or successful attack"); Recommendations of the Independent Panel Reviewing the Impact of Hurricane Katrina on Communications Networks, Notice of Proposed Rulemaking, 21 F.C.C.R. 7320, 7326 ¶¶ 16-17 (2006) (summarizing proposed ways to ensure adequate 911 service during natural disasters); *cf.* FINAL REPORT OF THE NATIONAL COMMISSION ON TERRORIST ATTACKS UPON THE UNITED STATES 318 (2004) (discussing importance of 911 in emergency responses to terrorist attacks); U.S. HOUSE OF REPRESENTATIVES, FINAL REPORT OF THE

4

SELECT BIPARTISAN COMMITTEE TO INVESTIGATE THE PREPARATION FOR AND RESPONSE TO HURRICANE KATRINA 163-64 (2006) (inoperability of 911 can impede emergency services in response to natural disasters).

In sum, the evidence establishes that adequate 911 service is vital to the personal security of American citizens and the homeland security of our Nation. The broad public safety and 911 authority Congress has granted the FCC therefore includes the authority to prevent providers from selling voice service that lacks adequate 911 capability.