# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-1069

_____

| | | |
|---|---|---|
| The Minnesota Public Utilities Commission; | * | |
| | * | |
| | * | |
| Petitioner, | * | |
| | * | |
| National Association of Regulatory Utility Commissioners; | * | |
| | * | |
| | * | |
| Intervenor on Behalf of Petitioner, | * | |
| | * | |
| | * | |
| Arizona Corporation Commission; State of New Jersey, Board of Public Utilities; State of Nebraska; State of California; State of Connecticut; | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| Amici on Behalf of Petitioner, | * | |
| | * | |
| | * | Petitions for Review |
| v. | * | of an Order of the Federal |
| | * | Communications Commission. |
| Federal Communications Commission; United States of America; | * | |
| | * | |
| | * | |
| Respondents, | * | |
| | * | |
| Vonage Holdings Corporation; Time Warner, Inc.; Time Warner Cable, Inc.; America Online, Inc.; Level 3 Communications, LLC; Charter Communications, Inc.; High Tech Broadband Coalition; 8 X 8, Inc.; | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| | * | |

Bellsouth Corporation; Qwest     *
Communications International, Inc.;     *
Verizon; The Voice on Net Coalition,     *
Inc.; Pulver.Com; Pacific Lightnet, Inc.; *
AT&T, Inc., formerly known as SBC     *
Communications Inc. and AT&T Corp;     *
    *
         Intervenors on Behalf     *
         of Respondents,     *
    *
California Public Utilities Commission;     *
    *
         Amicus on Behalf     *
         of Respondents.     *

_____

No. 05-1122

_____

National Association of State Utility     *
Consumer Advocates;     *
    *
         Petitioner,     *
    *
National Association of Regulatory     *
Utility Commissioners;     *
    *
         Intervenor on Behalf     *
         of Petitioner,     *
    *
Arizona Corporation Commission;     *
State of New Jersey, Board of Public     *
Utilities; State of Nebraska; State of     *
California; State of Connecticut;     *
    *
         Amici on Behalf     *
         of Petitioner,     *

v.                                           *
                                             *
Federal Communications Commission;           *
United States of America;                    *
                                             *
        Respondents,                         *
                                             *
Vonage Holdings Corporation; Time            *
Warner, Inc.; Time Warner Cable, Inc.;       *
America Online, Inc.; Level 3                *
Communications, LLC; Charter                 *
Communications, Inc.; High Tech              *
Broadband Coalition; 8 X 8, Inc.;            *
Bellsouth Corporation; Qwest                 *
Communications International, Inc.;          *
Verizon; The Voice on Net Coalition,         *
Inc.; Pulver.Com; Pacific Lightnet, Inc.;    *
AT&T, Inc., formerly known as SBC            *
Communications Inc. and AT&T Corp;           *
                                             *
        Intervenors on Behalf                *
        of Respondents,                      *
                                             *
California Public Utilities Commission;      *
                                             *
        Amicus on Behalf                     *
        of Respondents.                      *

        _____

        No. 05-3114
        _____

Public Utilities Commission of Ohio;         *
                                             *
        Petitioner,                          *
                                             *
National Association of Regulatory           *
Utility Commissioners;                       *

                                           -3-

|  | * |
| Intervenor on Behalf | * |
| of Petitioner, | * |
|  | * |
| Arizona Corporation Commission; | * |
| State of New Jersey, Board of Public | * |
| Utilities; State of Nebraska; State of | * |
| California; State of Connecticut; | * |
|  | * |
| Amici on Behalf | * |
| of Petitioner, | * |
|  | * |
| v. | * |
|  | * |
| Federal Communications Commission; | * |
| United States of America; | * |
|  | * |
| Respondents, | * |
|  | * |
| Vonage Holdings Corporation; Time | * |
| Warner, Inc.; Time Warner Cable, Inc.; | * |
| America Online, Inc.; Level 3 | * |
| Communications, LLC; Charter | * |
| Communications, Inc.; High Tech | * |
| Broadband Coalition; 8 X 8, Inc.; | * |
| Bellsouth Corporation; Qwest | * |
| Communications International, Inc.; | * |
| Verizon; Pulver.Com; | * |
| The Voice on Net Coalition, | * |
| Inc.; Pacific Lightnet, Inc.; | * |
| AT&T, Inc., formerly known as SBC | * |
| Communications Inc. and AT&T Corp; | * |
|  | * |
| Intervenors on Behalf | * |
| of Respondents, | * |
|  | * |
| California Public Utilities Commission; | * |
|  | * |
| Amicus on Behalf | * |
| of Respondents. | * |

_____

No. 05-3118

_____


People of the State of New York;          *
The Public Service Commission             *
of the State of New York;                 *
                                          *
                Petitioners,              *
                                          *
National Association of Regulatory        *
Utility Commissioners;                    *
                                          *
           Intervenor on Behalf           *
           of Petitioners,                *
                                          *
Arizona Corporation Commission;           *
State of New Jersey, Board of Public      *
Utilities; State of Nebraska; State of    *
California; State of Connecticut;         *
                                          *
           Amici on Behalf                *
           of Petitioners,                *
                                          *
        v.                                *
                                          *
Federal Communications Commission;        *
United States of America;                 *
                                          *
           Respondents,                   *
                                          *
Vonage Holdings Corporation; Time         *
Warner, Inc.; Time Warner Cable, Inc.;    *
America Online, Inc.; Level 3             *
Communications, LLC; Charter              *
Communications, Inc.; High Tech           *
Broadband Coalition; 8 X 8, Inc.;         *
Bellsouth Corporation; Qwest              *
Communications International, Inc.;        *

-5-

Verizon; Pulver.Com;                    *
The Voice on Net Coalition,             *
Inc.; Pacific Lightnet, Inc.;           *
AT&T, Inc., formerly known as SBC       *
Communications Inc. and AT&T Corp;      *
                                        *
            Intervenors on Behalf       *
            of Respondents,             *
                                        *
California Public Utilities Commission; *
                                        *
            Amicus on Behalf            *
            of Respondents.             *
                        _____

Submitted: January 12, 2006
Filed: March 21, 2007
                        _____

Before BYE, HEANEY,[1] and COLLOTON, Circuit Judges.
                        _____

BYE, Circuit Judge.

Before the court are consolidated petitions for review which challenge an order of the Federal Communications Commission (FCC) preempting state regulation of telecommunication services which utilize a relatively new technology called Voice over Internet Protocol (VoIP). The FCC preempted state regulation after determining it would be impractical, if not impossible, to separate the intrastate portions of VoIP service from the interstate portions, and state regulation would conflict with federal rules and policies. We conclude the issue raised in the petition filed by the Public

_____

[1]The Honorable Gerald W. Heaney resigned on August 31, 2006. This opinion is being issued by the remaining members of the panel pursuant to 8th Circuit Rule 47E.

Service Commission of the State of New York is not ripe for review and otherwise affirm the FCC's order and deny the petitions for review.

I

VoIP is an internet application utilizing "packet-switching" to transmit a voice communication over a broadband internet connection. In that respect, it is different from the "circuit-switching" application used to route traditional landline telephone calls. In circuit-switched communications, an electrical circuit must be kept clear of other signals for the duration of a telephone call. Packet-switched communications travel in small digital packets along with many other packets, allowing for more efficient utilization of circuits. While sophisticated, the application is also more cost effective than traditional circuit switches.

VoIP communications also differ from traditional circuit-switched telephone communications in another significant way. The end-to-end geographic locations of traditional landline-to-landline telephone communications are readily known, so it is easy to determine whether a particular phone call is intrastate or interstate in nature. Conversely, VoIP-to-VoIP communications originate and terminate at IP addresses which exist in cyberspace, but are tied to no identifiable geographic location. For example, a VoIP customer residing in Minnesota but visiting New York could connect a laptop computer to a broadband internet connection and communicate with a next-door neighbor via computer back in Minnesota, while the next day the same "caller" could be in Los Angeles and talk to the same friend who now happens to be in Los Angeles as well. The Internet would recognize both communications as taking place between the same two IP addresses, but when considering the geographic locations of the caller and recipient, the first call would be interstate while the second intrastate in nature.

Similarly, in VoIP-to-landline or landline-to-VoIP communications, known as "interconnected VoIP service,"[2] the geographic location of the landline part of the call can be determined, but the geographic location of the VoIP part of the call could be anywhere in the universe the VoIP customer obtains broadband access to the Internet, not necessarily confined to the geographic location associated with the customer's billing address or assigned telephone number. Furthermore, using the North American Numbering Plan (NANP) (i.e., the system of using a three-digit area code followed by a seven-digit number) or a VoIP customer's billing address as "proxies" for the originating or terminating points of interconnected VoIP communications causes some interstate calls to appear to be intrastate in nature and vice versa. In the example used above, if we assume both the caller and recipient had Minnesota billing addresses and NANP numbers with Minnesota area codes, both communications would appear to be intrastate Minnesota calls if the billing addresses or NANP numbers were used as proxies for the originating and terminating points of the communications, even though the first was an interstate call between New York and Minnesota and the second an intrastate California call.

The use of such proxies as substitutes for the actual originating and terminating points of VoIP communications is further complicated by the fact VoIP customers can choose NANP numbers with area codes different from those associated with their

---

[2]"Interconnected VoIP service" is defined as a service that:

(1) Enables real-time, two-way voice communications;
(2) Requires a broadband connection from the user's location;
(3) Requires Internet protocol-compatible customer premises equipment (CPE); and
(4) Permits users generally to receive calls that originate on the public switched telephone network and to terminate calls to the public switched telephone network.

47 C.F.R. § 9.3.

billing addresses. Again referring to the example used above, assume the VoIP customer residing in Minnesota chose a NANP number with an Arizona area code. In such a case, the interstate communication between New York and Minnesota would appear to be a Minnesota intrastate call if the customer's billing address were used as a proxy for the originating point, but appear to be an interstate call between Arizona and Minnesota if the NANP number were used as a proxy for the originating point.

A distinction can be drawn, however, between what is referred to as "nomadic" VoIP service and "fixed" VoIP service. Nomadic service is the type described above, where a VoIP customer can use the service "nomadically" by connecting with a broadband internet connection anywhere in the universe to place a call. Fixed VoIP service describes the use of the same technology, that is, converting a voice communication into digital packets before transmitting it to another location, but in a way where the service is used from a fixed location. For example, cable television companies offer VoIP service to their customers, but when they do so the ensuing transmissions use the cable running to and from the customer's residence. As a result, the geographic originating point of the communications can be determined. Thus, when VoIP is offered as a fixed service rather than a nomadic service, the interstate and intrastate portions of the service can be more easily distinguished.

The use of VoIP technology has grown rapidly, and with this growth has come controversy over the technology's regulatory status. Some VoIP providers contend the service should be classified for regulatory purposes as an "information service" which, like the Internet itself, Congress has deemed should be free from almost all federal and state regulation. Meanwhile, many state regulators argue VoIP service should be classified as a "telecommunications service," with the intrastate aspects of the service regulated at the state level and the interstate aspects regulated at the federal level. A primary point of contention about how VoIP service should be regulated deals with the provision of emergency 911 services, which necessitate the identification of a caller's geographic location.

With this oversimplified summary of VoIP service as a backdrop, we consider the particular dispute which gave rise to the consolidated petitions for review now before our court.

II

On July 15, 2003, the Minnesota Department of Commerce (MDOC) filed a complaint with the Minnesota Public Utilities Commission (MPUC) alleging the DigitalVoice services being offered by Vonage Holdings Corporation (Vonage), which utilized VoIP technology, were "telephone services." The complaint further alleged Vonage was offering such services without complying with the state regulations governing telephone services – such as obtaining a service permit and filing a tariff listing the prices, terms, and conditions applicable to DigitalVoice. As a result of the MDOC's complaint, the MPUC ordered Vonage to comply with the Minnesota regulations applicable to telephone service and to cease and desist offering DigitalVoice services within the state until it did so.

In response to the MPUC's order, Vonage filed a petition with the FCC requesting it to preempt the order on the grounds Vonage was a provider of "information services," rather than a "telecommunications carrier," and thus exempt from state regulation for its DigitalVoice service. In the alternative, Vonage invoked the "impossibility exception" of 47 U.S.C. § 152(b), which allows the FCC to preempt state regulation of a service which would otherwise be subject to dual federal and state regulation where it is impossible or impractical to separate the service's intrastate and interstate components, and the state regulation interferes with valid federal rules or policies. See La. Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 368 (1986) (indicating the FCC can preempt state law "where compliance with both federal and state law is in effect physically impossible"); see also id. at 375 n.4 ("FCC pre-emption of state regulation [should be ] upheld where it [is] not possible to separate the interstate and the intrastate components of the asserted FCC regulation.").

Vonage also filed suit against the MPUC in federal district court seeking to enjoin enforcement of the cease and desist order. The district court granted a permanent injunction which barred the MPUC from enforcing its order, concluding Vonage was providing "information services" rather than "telecommunication services" and therefore not subject to state regulation. Vonage Holdings Corp. v. Minn. Pub. Utils. Comm'n, 290 F. Supp. 2d 993, 999 (D. Minn. 2003). The MPUC appealed the ruling to the Eighth Circuit.

While the MPUC's appeal was pending, the FCC issued an order addressing Vonage's petition. In its order, the FCC adopted Vonage's alternative position, which is, irrespective of whether Vonage's services should be characterized as "telecommunication services" or "information services," the FCC determined it was appropriate to preempt state regulation because it was impossible or impractical to separate the intrastate components of VoIP service from its interstate components. The FCC stated: "[T]he practical inseverability of other types of IP-enabled services having basic characteristics similar to DigitalVoice *would* likewise preclude state regulation . . .. Accordingly, to the extent other entities, such as cable companies, provide VoIP services, we *would* preempt state regulation to an extent comparable to what we have done in this Order." In re Vonage Holdings Corp., 19 F.C.C.R. 22404, 22424 at ¶ 32 (2004), 2004 WL 2601194 at **11 (emphasis added).

Shortly after the FCC issued its ruling on Vonage's petition, the Eighth Circuit concluded the FCC order was binding with respect to the MPUC's appeal of the permanent injunction barring enforcement of the cease and desist order, unless and until an aggrieved party invoked jurisdiction under the Hobbs Act, relevant provision codified at 28 U.S.C. § 2342, by filing a petition for review in an appropriate court of appeals seeking direct review of the FCC's order. Vonage Holdings Corp. v. Minn. Pub. Utils. Comm'n, 394 F.3d 568, 569 (8th Cir. 2004). Following the FCC's order, several petitions seeking direct review of the order were filed in various courts of appeals – one in the Second Circuit, one in the Sixth Circuit, and two in the Eighth

-11-

Circuit. After brief transfers to the Ninth Circuit, all four petitions ultimately found their way to the Eighth Circuit and were consolidated into this one case.

The four primary issues raised in the consolidated petitions are whether the FCC's order is arbitrary and capricious because it (1) failed to make a threshold determination about whether VoIP services were "information services" or "telecommunications services," (2) determined it is impractical or impossible to separate the intrastate components of VoIP service from its interstate components, (3) determined state regulation of VoIP service conflicts with federal regulatory policies, and (4) preempted emergency 911 telephone service requirements. A fifth issue raised in the petition filed by the Public Service Commission of the State of New York is whether ¶ 32 of the FCC's order arbitrarily preempted "fixed" VoIP services offered by cable television companies, even though the intrastate components of such service can more easily be separated from the interstate components of such services.

III

This court reviews a federal agency's decision under the Administrative Procedure Act (APA) and will set aside the decision only when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Mages v. Johanns, 431 F.3d 1132, 1139 (8th Cir. 2005) (quoting 5 U.S.C. § 706(2)(A)).

> [W]hen the resolution of the dispute involves primarily issues of fact and analysis of the relevant information requires a high level of technical expertise, we must defer to the informed discretion of the responsible federal agencies. The scope of our review is narrow and we are not to substitute our judgment for that of the agency.

Cent. S.D. Coop. Grazing Dist. v. Sec'y of U.S. Dep't of Agric., 266 F.3d 889, 894-95 (8th Cir. 2001) (internal citations and quotations omitted).

-12-

The first issue is whether the FCC arbitrarily or capriciously failed to classify VoIP service as either an "information service" or a "telecommunications service." The FCC concluded state regulation of VoIP service should be preempted regardless of its regulatory classification because it was impossible or impractical to separate the intrastate components of VoIP service from its interstate components. The FCC deferred resolution of the regulatory classification of VoIP service in its order because the issue was already "the subject of [its] *IP-Enabled Services Proceeding* where the Commission is comprehensively examining numerous types of IP-enabled services, including services like DigitalVoice." In re Vonage Holdings Corp., 19 F.C.C.R. at 22411 n.46. As to this order, the FCC contends the dispositive nature of the impossibility exception made it unnecessary to first classify VoIP service. See Nat'l Cable & Telecomms. Ass'n v. Gulf Power Co., 534 U.S. 327, 338 (2002) ("[D]ecisionmakers sometimes dodge hard questions where easier ones are dispositive.").

In Gulf Power, the Supreme Court described as "sensible" the FCC's decision not to determine "whether [Internet services] are cable services" under the Communications Act, given the FCC's decision that such a determination was unnecessary for the FCC to assert jurisdiction over pole-attachment rates for Internet traffic. 534 U.S. at 337. This case is similar to Gulf Power. The impossibility exception, if applicable, is dispositive of the issue whether the FCC has authority to preempt state regulation of VoIP services. It was therefore sensible for the FCC to address that question first without having to determine whether VoIP service should be classified as a telecommunication service or an information service.

The next issue is whether the FCC arbitrarily or capriciously concluded the impossibility exception applies to VoIP services. As already discussed, the "impossibility exception" of 47 U.S.C. § 152(b) allows the FCC to preempt state regulation of a service if (1) it is not possible to separate the interstate and intrastate aspects of the service, and (2) federal regulation is necessary to further a valid federal regulatory objective, i.e., state regulation would conflict with federal regulatory

-13-

policies. Qwest Corp. v. Scott, 380 F.3d 367, 372 (8th Cir. 2004). We address each of the components of the impossibility exception in turn.

The FCC determined on the basis of the record before it that there was no "practical means . . . of directly or indirectly identifying the geographic location of a DigitalVoice subscriber." In re Vonage Holdings Corp., 19 F.C.C.R. at 22418 ¶ 23. The FCC further emphasized

> the significant costs and operational complexities associated with modifying or procuring systems to track, record and process geographic location information as a necessary aspect of the service would substantially reduce the benefits of using the Internet to provide the service, and potentially inhibit its deployment and continued availability to consumers.
>
> . . .
>
> The Internet's inherently global and open architecture obviates the need for any correlation between Vonage's DigitalVoice service and its end users' geographic locations.

Id. at ¶¶ 23-24. Additionally, the FCC recognized communications over the Internet were very different from traditional landline-to-landline telephone calls because of the multiple service features which might come into play during a VoIP call, i.e., "access[ing] different websites or IP addresses during the same communication and [] perform[ing] different types of communications simultaneously, none of which the provider has a means to separately track or record [by geographic location]." Id. at ¶ 25.

It was proper for the FCC to consider the economic burden of identifying the geographic endpoints of VoIP communications in determining whether it was impractical or impossible to separate the service into its interstate and intrastate components. See California v. FCC, 75 F.3d 1350, 1359 (9th Cir. 1996) ("The FCC

is empowered 'to make reasonable assumptions about economic impact based on the evidence currently available.'" quoting N.C. Utils. Comm'n v. FCC, 552 F.2d 1036, 1056 (4th Cir. 1977))). Service providers are not required to develop a mechanism for distinguishing between interstate and intrastate communications merely to provide state commissions with an intrastate communication they can then regulate. Cf. Ill. Bell Tel. Co. v. FCC, 883 F.2d 104, 116 (D.C. Cir. 1989) (noting the Communications Act does not require "construction of wholly independent intrastate and interstate networks"); see also California v. FCC, 567 F.2d 84, 86 (D.C. Cir. 1977) (upholding FCC preemption on basis that it would be "impractical" to require investment in "expensive additional equipment" solely to create a separate intrastate communication service). In addition, the issue whether VoIP services can be separated into interstate and intrastate components is a largely fact-driven inquiry requiring a high level of technical expertise. As noted above, in such situations we accord a high level of deference to the informed decision of the agency charged with making those fact findings. See Cent. S.D. Coop. Grazing Dist., 266 F.3d at 894-95. After carefully examining the record in this case, as well as the parties' arguments, we conclude the FCC did not arbitrarily or capriciously determine it was impractical or impossible to separate the intrastate components of VoIP service from its interstate components.

Because of the high level of deference we owe to the FCC on this fact-specific issue, it is unnecessary to justify our decision by countering all of the petitioners' challenges to the FCC's fact-findings, and instead we focus our attention on the primary contention raised on appeal – the alleged inconsistency between the FCC order challenged here and a subsequent order issued by the FCC addressing VoIP 911 service. See In Re IP-Enabled Servs. & E911 Requirements for IP-Enabled Service Providers (911 Order) 20 F.C.C.R. 10245 (2005), 2005 WL 1323217. The petitioners contend the two orders are inconsistent – while the first finds it impractical or impossible to identify the geographic end-points of VoIP communications, the second requires VoIP providers to do just that for the purpose of ensuring customers using VoIP service can obtain 911 services when the need arises. The petitioners contend the 911 Order requires Vonage to pinpoint the geographic source of the call. They

argue it necessarily follows that the intrastate and interstate components of the service can then be separated.

The 911 Order does not provide a basis for concluding the order before us is arbitrary and capricious. Contrary to the assertions of the state public utilities commissions, the 911 Order also recognizes the practical difficulties of accurately determining the geographic location of VoIP customers when they place a phone call. See 911 Order, 20 F.C.C.R. 10245 at 10259 ¶ 25 ("VoIP service providers often have no reliable way to discern from where their customers are accessing VoIP service."); see also Nuvio Corp. v. FCC, 473 F.3d 302, 303, 304 (D.C. Cir. 2007) (denying a petition for review challenging the 911 Order and noting "there are no means yet available to easily determine the location of a caller using interconnected VoIP service [and] it is not yet technologically feasible to detect automatically the location of nomadic VoIP callers."). Recognizing this practical difficulty, the FCC devised a temporary solution requiring VoIP service providers to have their customers register the physical location at which they would first utilize VoIP service, and to also provide a means for customers to update these registered locations. Under this temporary fix, responses to 911 calls would be routed to the registered location, which may not be the same as the actual location where the call was placed. See Nuvio Corp., 473 F.3d at 304-05 (explaining the limited scope of the 911 Order). Thus, in both the order before us and the 911 Order, the FCC recognized the practical difficulties of determining the geographic location of nomadic VoIP phone calls.

Moreover, subsequent to issuing the order we are reviewing, the FCC recognized the potentially limited temporal scope of its preemption of state regulation in this area in the event technology is developed to identify the geographic location of nomadic VoIP communications. In proceedings to address VoIP service providers' responsibility to contribute to the universal service fund, the FCC indicated

> an interconnected VoIP provider with a capability to track the
> jurisdictional confines of customer calls would no longer qualify for the

-16-

preemptive effects of our <u>Vonage Order</u> and would be subject to state regulation. This is because the central rationale justifying preemption set forth in the <u>Vonage Order</u> would no longer be applicable to such an interconnected VoIP provider.

<u>Universal Serv. Contribution Methodology</u>, 21 F.C.C.R. 7518 at 7546 ¶ 56 (2006), 2006 WL 1765838.

Similarly, we emphasize the limited scope of our review of the FCC's decision. Our review is limited to the issue whether the FCC's determination was reasonable based on the record existing before it at the time. If, in the future, advances in technology undermine the central rationale of the FCC's decision, its preemptive effect may be reexamined.

The FCC also determined state regulation of VoIP service would interfere with valid federal rules or policies. Because the FCC deferred the regulatory classification of VoIP service to its <u>IP-Enabled Services Proceeding</u>, the FCC examined whether state and federal policies would conflict regardless of whether DigitalVoice were classified as an information service or a telecommunications service. The FCC determined conflicts would exist in either event.

With respect to the conflicts which would exist if DigitalVoice were classified as a telecommunications service, the FCC explained "Vonage would be considered a nondominant, competitive telecommunications provider for which the Commission has eliminated entry and tariff filing requirements." <u>In re Vonage Holdings Corp.</u>, 19 F.C.C.R. at 22415 ¶ 20. In contrast, Minnesota law would compel a tariffed offering. Similarly, Minnesota law has entry requirements under which Vonage would be required to obtain a certificate of authority from the MPUC before offering its services in Minnesota. The FCC noted it eliminated tariff requirements for the purpose of promoting competition and the public interest, and Minnesota's tariff requirement

"*may actually harm consumers* by impeding the development of vigorous competition." Id. at 22416 ¶ 20 (emphasis added).

With respect to the conflicts which would develop if DigitalVoice were classified as an information service, the FCC referred to its "long-standing national policy of nonregulation of information services." Id. at ¶ 21. The FCC has promoted a market-oriented policy allowing providers of information services to "burgeon and flourish in an environment of free give-and-take of the market place without the need for and possible burden of rules, regulations and licensing requirements." Id. (internal quotations and citations omitted). Thus, any state regulation of an information service conflicts with the federal policy of nonregulation.

The FCC's conclusions regarding the conflicts between state regulation and federal policy deserve "weight" – the agency has a "thorough understanding of its own [regulatory framework] and its objectives and is uniquely qualified to comprehend the likely impact of state requirements." Geier v. Am. Honda Motor Co., 529 U.S. 861, 883 (2000) (internal quotations and citations omitted). Competition and deregulation are valid federal interests the FCC may protect through preemption of state regulation. E.g., Computer and Commc'ns Indus. Ass'n v. FCC, 693 F.2d 198, 214-18 (D.C. Cir. 1982) (concluding the FCC may preempt state regulation to promote a federal policy of fostering competition in the market for customer premises equipment). After carefully considering the positions presented by both sides of this dispute, we conclude the FCC did not arbitrarily or capriciously determine state regulation of VoIP service would interfere with valid federal rules or policies.

The next issue is whether the FCC arbitrarily or capriciously preempted Minnesota's 911 requirements. Minnesota "includes as one of its entry conditions the approval of a 911 service plan 'comparable to the provision of 911 service by the [incumbent] local exchange carrier.'" In re Vonage Holdings Corp., 19 F.C.C.R. at 22430 ¶ 42 (quoting Minn. R. § 7812.0550, Subpt 1). The FCC determined this requirement "inextricably links pre-approval of a 911 plan to becoming certificated

to offer services in the state" and thus "operates as an entry regulation." Id. Because the FCC had already determined there was no practical way for Vonage to identify the geographic location of the calls placed by its customers, Vonage could not comply with this entry regulation and thus the requirement effectively barred Vonage from entry into Minnesota. As a consequence, the FCC preempted "this requirement along with all other entry requirements contained in Minnesota's 'telephone company' regulations." Id.

Relying upon the obligations imposed upon VoIP providers under FCC's subsequent 911Order (issued June 3, 2005), the MPUC contends Vonage could have complied with Minnesota's 911 requirement. We disagree. The FCC's VoIP 911 requirements did not exist when the MPUC asserted jurisdiction over Vonage, or when the FCC issued the order at issue here. As a consequence, it is improper for the MPUC to rely upon the 911 Order to challenge the reasonableness of the FCC decision now before us. See 47 U.S.C. § 405(a) (providing that a party must file a petition for agency reconsideration before it may seek judicial review of an issue over which the FCC has had no "opportunity to pass"). Moreover, there is no guarantee Minnesota would accept as sufficient for its purposes the requirements imposed upon VoIP providers under the 911 Order. As the FCC noted in the 911 Order, there are a variety of "differences in state laws and regulations governing the provision of 911 service." 911 Order, 20 F.C.C.R. at 10251 n.34 Because of the nomadic nature of VoIP service, we agree with the FCC there is a need for "setting national rules for 911/E911 service[]." Id. at 10259 ¶ 25. The FCC did not arbitrarily or capriciously preempt Minnesota's 911 requirements.

Finally, the New York Public Service Commission (NYPSC) challenges ¶ 32 of the FCC's order contending its apparent preemption of all state regulation of VoIP services – including "fixed" services – exceeds its jurisdiction. The NYPSC argues fixed VoIP telephony is no different than traditional landline telephony and the FCC should have utilized an end-to-end analysis which looks to the geographic endpoints of the communications. According to the NYPSC, end-users making telephone calls

via fixed VoIP networks to other users of fixed VoIP or to landline customers are making calls with known endpoints and it is possible to identify intrastate calls.

The NYPSC argues the FCC improperly invoked the impossibility exception under 47 U.S.C. § 152(b), because it is not impossible to separate the interstate and intrastate components of the FCC regulation, and state regulation would not negate the FCC's lawful authority over interstate communication. It contends the FCC's analysis may apply to state regulation of nomadic services, such as Vonage's Digital Voice, but cannot justify preemption of fixed services because the geographic locations of users placing calls over fixed VoIP services can be readily identified and the calls can be regulated by the state.

The NYPSC also disputes the FCC's conclusion that "the provision of tightly integrated communications capabilities greatly complicates the isolation of intrastate communication and counsels against patchwork regulation." In re Vonage Holdings Corp., 19 F.C.C.R. at 22424 ¶ 32. The NYPSC contends traditional telephone networks offer the same ability to manage personal communications using integrated features such as caller ID, call blocking, call forwarding, three-way calling, call waiting, and also enable access to text, audio, data and video. It submits that none of these characteristics have defeated state regulation of wireline telephony in the past and cannot justify the FCC's preemption of comparable fixed VoIP technology in this instance.

Finally, the NYPSC argues the FCC has not met its burden of justifying the preemption of all VoIP services because it has not demonstrated the regulation is narrowly tailored to preempt only those state regulations which would negate FCC regulations. While the preemption of nomadic VoIP services may be justified by the need to eliminate entry and tariffing requirements for nondominant interstate interexchange service providers, the NYPSC contends the FCC has not adequately explained the need to preempt fixed VoIP service providers.

The FCC argues this issue is not ripe for judicial review. Its order states "to the extent other entities, such as cable companies, provide VoIP services, we *would* preempt state regulation to an extent comparable to what we have done in this Order." Id. (emphasis added). Because the order only addresses services "having basic characteristics similar to Digital Voice," id., and does not specifically address fixed VoIP service providers, the FCC argues the NYPSC's appeal is premature. The FCC contends the language is at most a prediction of what it might do if faced with the issue of fixed VoIP service providers, and argues we should decline to rule on the merits of the NYPSC's appeal until presented with an order preempting state regulation of fixed VoIP service providers.

We are limited by Article III of the Constitution to deciding actual cases or controversies ripe for review.

> The basic rationale of the ripeness doctrine is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

Missouri v. Cuffley, 112 F.3d 1332, 1337 (8th Cir. 1997) (internal quotations and citations omitted). "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" Texas v. United States, 523 U.S. 296, 300 (1998) (quoting Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 580-581 (1985)).

We conclude the NYPSC's challenge to the FCC's order is not ripe for review. The order only suggests the FCC, if faced with the precise issue, would preempt fixed VoIP services. Nonetheless, the order does not purport to actually do so and until that day comes it is only a mere prediction. See U.S. Telecom Ass'n v. FCC, 359 F.3d 554, 594 (D.C. Cir. 2004) (holding a general prediction set forth in order does not

constitute final agency action).  Indeed, as we noted, the FCC has since indicated VoIP providers who can track the geographic end-points of their calls do not qualify for the preemptive effects of the Vonage order.  See Universal Serv. Contribution Methodology, 21 F.C.C.R. at 7546 ¶ 56.  As a consequence, NYPSC's contention that state regulation of fixed VoIP services should not be preempted remains an open issue.

## IV

For the reasons stated, we conclude the issue raised in the petition filed by the NYPSC is not ripe for review and otherwise affirm the FCC's order and deny the petitions for review.

_____